DR. ALVIS L. CORUM v. UNIVERSITY OF NORTH CAROLINA THROUGH ITS BOARD OF GOVERNORS; C. D. SPANGLER, PRESIDENT OF THE UNIVERSITY OF NORTH CAROLINA IN HIS OFFICIAL CAPACITY; APPALACHIAN STATE UNIVERSITY; AND JOHN THOMAS, CHANCELLOR OF APPALACHIAN STATE UNIVERSITY, AND HARVEY DURHAM

No. 163PA90

(Filed 31 January 1992)

1. **Constitutional Law § 86 (NCI4th) — § 1983 claims — UNC, ASU and university officials — official capacities — damages claims barred**

   Plaintiff was barred from seeking damages under 42 U.S.C. § 1983 from the University of North Carolina, Appalachian State University, the president of the University of North Carolina in his official capacity, and the chancellor and a vice chancellor of Appalachian State University in their official capacities because neither a state nor its officials acting in their official capacities are "persons" under § 1983 when the remedy sought is monetary damages.

   **Am Jur 2d, Civil Rights §§ 17, 264.**

CORUM v. UNIVERSITY OF NORTH CAROLINA

[330 N.C. 761 (1992)]

**Public institutions of higher learning as "persons" subject to suit under 42 USCS sec. 1983. 65 ALR Fed 490.**

2. **Constitutional Law § 86 (NCI4th) — § 1983 claims — UNC, ASU and university officials — official capacities — injunctive relief permissible**

    Plaintiff could properly bring actions under 42 U.S.C. § 1983 for injunctive relief against UNC, ASU, and the individual defendants in their official capacities because state institutions or employees acting in their official capacities are "persons" reachable under § 1983 when sued for prospective equitable relief.

    **Am Jur 2d, Civil Rights §§ 17, 264.**

    **Public institutions of higher learning as "persons" subject to suit under 42 USCS sec. 1983. 65 ALR Fed 490.**

3. **Constitutional Law § 86 (NCI4th) — § 1983 claims — official capacities — sovereign and qualified immunity inapplicable**

    Sovereign immunity alleged under state law is not a permissible defense to § 1983 actions. Nor is the defense of qualified immunity available under § 1983 to one sued in his official capacity. Insofar as *Truesdale v. University of North Carolina*, 91 N.C. App. 186, 371 S.E.2d 503, states that § 1983 claims against state institutions are barred by the doctrine of sovereign immunity, it is overruled.

    **Am Jur 2d, Constitutional Law §§ 283, 713, 717.**

4. **Constitutional Law § 86 (NCI4th) — § 1983 claims — individual capacities — damages — qualified immunity**

    State government officials may be sued in their individual capacities for damages under 42 U.S.C. § 1983, but officials sued as individuals may raise a defense of qualified immunity.

    **Am Jur 2d, Civil Rights §§ 268, 269.**

5. **Constitutional Law § 86 (NCI4th) — § 1983 claims — individual capacities — objective test for qualified immunity — motivation**

    State officials sued for constitutional violations under 42 U.S.C. § 1983 will be protected from liability by qualified immunity where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Where the existence of a constitu-

tional violation depends on proof of motivation, proof of the official's intent is required to determine whether the qualified immunity defense is appropriate.

**Am Jur 2d, Civil Rights §§ 268, 269.**

6. **Constitutional Law § 115 (NCI4th) — public official — free speech limitations**

A public employee's right to free speech is limited by the government's need to preserve efficient governmental functions. Furthermore, only speech on a matter of "public concern" is constitutionally protected, and in determining whether speech fits in this category, the court must examine the content, form and context of the public employee's speech.

**Am Jur 2d, Constitutional Law §§ 496, 497.**

7. **Constitutional Law § 115 (NCI4th) — free speech — relocation of Appalachian Collection — matter of public concern**

Speech by plaintiff, the Dean of Learning Resources at ASU, concerning the relocation of the Appalachian Collection at ASU addressed a matter of public concern for free speech purposes.

**Am Jur 2d, Constitutional Law §§ 496, 497.**

8. **Constitutional Law § 115 (NCI4th) — relocation of Appalachian Collection — free speech right of plaintiff**

Plaintiff, the Dean of Learning Resources at ASU, had a constitutionally protected right to speak out in 1984 about a vice chancellor's directive for relocation of the Appalachian Collection which would separate the artifacts from the written materials and to propose an alternate plan which would keep the entire Collection intact when it was moved, since such speech did not impede plaintiff's duties or interfere with the regular operation of ASU; the speech did not affect the vice chancellor's decision to relocate the Appalachian Collection and its danger to the organization was *de minimus*; and plaintiff's interest in speaking out on this public issue thus outweighed any negative effect it might have had on the efficient functioning of ASU.

**Am Jur 2d, Constitutional Law §§ 496, 497.**

9. **Constitutional Law § 115 (NCI4th) — § 1983 claim — ASU vice chancellor — demotion of plaintiff — free speech — evidence of motive — summary judgment improper**

In plaintiff's 42 U.S.C. § 1983 action against a vice chancellor of ASU in his individual capacity based on plaintiff's claim that his right to free speech was violated when he was removed as Dean of Learning Resources of ASU because of statements he made at a staff meeting concerning the vice chancellor's plan for relocation of the Appalachian Collection, plaintiff presented sufficient evidence of improper motive to raise a material question as to whether a reasonable vice chancellor would have believed that demoting plaintiff was lawful where the vice chancellor's evidence indicates that his motive for demoting plaintiff was to promote discipline and efficient administration and to punish insubordination, but plaintiff presented specific evidence indicating that defendant's motive was to stifle debate about where to relocate the Appalachian Collection, to carry out his decision to split the Collection quickly, and to punish plaintiff. Therefore, defendant vice chancellor's motion for summary judgment based upon the defense of qualified immunity was properly denied by the trial judge.

**Am Jur 2d, Civil Rights §§ 19, 20.**

10. **Constitutional Law § 86 (NCI4th) — § 1983 claims — UNC, ASU and university officials — summary judgment proper**

Summary judgment should have been entered in favor of UNC, ASU, the president of UNC, and the chancellor of ASU on all of plaintiff's 42 U.S.C. § 1983 claims based on his removal as the Dean of Learning Resources at ASU where plaintiff failed to present a forecast of evidence as to any improper action or motive by these defendants.

**Am Jur 2d, Civil Rights § 287.**

11. **Constitutional Law § 115 (NCI4th) — free speech violation by state official — direct claim under N.C. Constitution**

A plaintiff has a direct cause of action under the N.C. Constitution against state officials in their official capacities for alleged violations of plaintiff's right of free speech, and the common law will provide the appropriate remedy for the adequate redress of a violation of that right. Therefore, plain-

CORUM v. UNIVERSITY OF NORTH CAROLINA

[330 N.C. 761 (1992)]

tiff had a direct cause of action under the N.C. Constitution against a vice chancellor of ASU for an alleged violation of his free speech rights based on his removal as Dean of Learning Resources at ASU.

**Am Jur 2d, Civil Rights § 261; Constitutional Law § 496.**

12. **Constitutional Law § 115 (NCI4th); Courts § 3 (NCI4th) — violation of free speech right — common law remedy — limitations on judiciary**

It will be a matter for the trial judge to craft the necessary relief for a violation of a plaintiff's free speech right under the N.C. Constitution. When called upon to exercise its inherent constitutional power to fashion a common law remedy for a violation of a particular constitutional right, however, the judiciary must recognize two critical limitations: (1) it must bow to established claims and remedies where those provide an alternative to the extraordinary exercise of its inherent constitutional power, and (2) in exercising that power, it must minimize the encroachment upon other branches of government — in appearance and in fact — by seeking the least intrusive remedy available and necessary to right the wrong.

**Am Jur 2d, Constitutional Law § 316.**

13. **Constitutional Law § 115 (NCI4th); State § 4.2 (NCI3d) — free speech violation — sovereign immunity inapplicable**

The doctrine of sovereign immunity is inapplicable to a plaintiff's claim for violation of his free speech rights or other rights protected by the Declaration of Rights of the N.C. Constitution. When there is a clash between these constitutional rights and judge-made sovereign immunity, the constitutional rights must prevail. Art. I, § 14 of the N.C. Constitution.

**Am Jur 2d, Civil Rights § 261; Constitutional Law § 496.**

14. **Constitutional Law § 115 (NCI4th) — free speech violation — no direct claim under N.C. Constitution against individual**

A plaintiff has no direct cause of action for monetary damages under the N.C. Constitution against persons sued in their individual capacities for violations of plaintiff's free speech rights.

**Am Jur 2d, Civil Rights § 261; Constitutional Law § 496.**

**15. Constitutional Law § 115 (NCI4th) — free speech claims under N.C. Constitution — UNC, ASU and university officials — summary judgment proper**

Plaintiff failed to present a forecast of evidence sufficient to defeat the motion for summary judgment on behalf of UNC, ASU, the president of UNC, and the chancellor of ASU as to plaintiff's claims under the N.C. Constitution for violation of his free speech rights based on his removal as Dean of Learning Resources at ASU.

**Am Jur 2d, Civil Rights § 261; Constitutional Law § 496.**

Justice WEBB dissents.

ON appeal and discretionary review of an opinion by the Court of Appeals, 97 N.C. App. 527, 389 S.E.2d 596 (1990), reversing an order entered 21 October 1988 by *Gray, J.,* which denied defendants' motion for summary judgment. Heard in the Supreme Court 11 February 1991.

*Ferguson, Stein, Watt, Wallas, Adkins & Gresham, P.A., by John W. Gresham, for plaintiff-appellant/appellee.*

*Lacy H. Thornburg, Attorney General, by Thomas J. Ziko, Special Deputy Attorney General, and Laura E. Crumpler, Assistant Attorney General, for defendant-appellants/appellees.*

*William G. Simpson, Jr., John Vail, Travis Payne, J. Michael McGuinness, for amicus curiae North Carolina Civil Liberties Union Legal Foundation; and M. Jackson Nichols, for amicus curiae North Carolina Association of Educators.*

MARTIN, Justice.

For the reasons stated below, we reverse in part and affirm in part the decision of the Court of Appeals. Plaintiff filed this action on 20 February 1987 seeking injunctive relief and damages for the defendants' alleged retaliation against plaintiff for his exercise of certain free speech rights. Plaintiff's claims were brought under the North Carolina Constitution Article I, Sections 14, 19, and 35 and 42 U.S.C. § 1983. After filing an answer containing defenses, which included sovereign immunity and qualified immunity, defendants moved for summary judgment. Defendants' motion for summary judgment was denied on 21 October 1988.

CORUM v. UNIVERSITY OF NORTH CAROLINA

[330 N.C. 761 (1992)]

Defendants appealed the denial of their motion for summary judgment to the Court of Appeals. The Court of Appeals properly reasoned that a denial of a summary judgment motion is normally not immediately appealable; however, under the case of *Mitchell v. Forsyth*, 472 U.S. 511, 86 L. Ed. 2d 411 (1985), when a motion for summary judgment based on immunity defenses to a section 1983 claim is denied, such an interlocutory order is immediately appealable before final judgment. The Court of Appeals went on to hold that the trial court erred in denying defendants' summary judgment motion with respect to plaintiff's 42 U.S.C. § 1983 claims, except for the motion pertaining to plaintiff's claims against individual defendants Spangler, Thomas, and Durham in their official capacities only for prospective injunctive relief. The Court of Appeals further held that the trial court erred in failing to grant defendants' motion for summary judgment with respect to plaintiff's claims brought under the State Constitution regarding the University of North Carolina, Appalachian State University, and the three individual defendants in their official capacities. The Court of Appeals also held that the defendants' motion was properly denied insofar as it concerned plaintiff's claims for monetary damages against the two individually named defendants for violation of plaintiff's state constitutional rights.

Viewing the record in the light most favorable to plaintiff, as we must when evaluating a summary judgment motion, the following facts arise upon the record. In early summer 1984, the plaintiff, a tenured faculty member at Appalachian State University, was the Dean of Learning Resources, a position he had held for approximately fourteen years. As Dean, Dr. Corum's responsibilities included supervising Appalachian State University's academic support units, including the library, the audiovisual services, and the Appalachian Collection. The Appalachian Collection, a diversified collection of books, research reports, music, and artifacts, represents the mountain culture of the Southern Appalachian Region. Until mid-summer 1984 the Appalachian Collection was housed in the Daughtery Library.

Beginning in September 1983 and continuing for several months, various administrators at Appalachian State University ("ASU") discussed the possibility of moving the Appalachian Collection out of the Daughtery Library into different facilities. The plaintiff's chief concern regarding this move was that the Appalachian Collection remain intact so that the artifacts would not be split off from

the books, manuscripts, and other materials. In the administrative chain of command at ASU the person responsible for deciding where the Appalachian Collection would be moved and whether it would be broken up was defendant, Dr. Harvey Durham. Dr. Durham was the Vice Chancellor for Academic Affairs and Dr. Corum's immediate supervisor.

In December 1983 Dr. Durham decided to split up the Collection and move the artifacts to University Hall, a building on the campus where the artifacts would form the basis of a new museum. The decision to split the artifacts off from the rest of the Collection was not communicated to Dr. Corum at this time; however, the decision was documented by a memorandum written at or near the time of the decision.

On 21 June 1984 Dr. Durham informed Dr. Corum that the Appalachian Collection would be moved to University Hall and that the move would need to be completed within a two-week period. On that same day, Dr. Durham informed Dr. Corum that the relocation of the Collection also entailed removing the personnel and budget supporting the Collection from Dr. Corum's purview to a new administrative home. While Dr. Corum expressed concern over this transfer, he accepted the decision as one which was workable because, in his understanding, it would at least maintain the physical integrity of the Collection. Dr. Durham did not inform Dr. Corum at this time that the artifacts would be separate from the rest of the Collection. Dr. Corum proceeded to set up a subsequent meeting with relevant administrators in order to work out the details of the moving of the Collection; the next meeting was scheduled for 25 June 1984.

At the 25 June meeting, Dr. Corum met with Dr. Barker, ASU's Librarian; Ms. Ball, the library staff member associated with the Appalachian Collection; and Dr. Clinton Parker, an Associate Vice Chancellor of Academic Affairs. Dr. Parker attended the meeting as Dr. Durham's representative because Dr. Durham had gone out of town. At the outset of the meeting on 25 June, Dr. Parker announced to those assembled that the written materials in the Appalachian Collection would be moved to University Hall, while the artifacts would be stored in Belk Library. Dr. Corum later testified that he saw this announcement as a dramatic shift from the directions previously given to him by defendant Durham.

The day after this meeting, plaintiff sought to present an alternative plan for the relocation of the Appalachian Collection, a plan that would keep the Collection secure and physically intact. Dr. Corum read aloud his proposal for an alternate location during a meeting held 26 June 1984 that was attended by Dr. Parker and Dr. William Strickland, Dean of Arts and Sciences at ASU. In the memorandum that he read to those assembled, Dr. Corum claimed that Dr. Durham's decision to move the Collection to University Hall presented many problems. Dr. Corum proposed instead to move the Collection into Belk Library and intershelve the holdings with the regular university library. To this proposal Dr. Parker responded that he had no authority to change Dr. Durham's decision. However, Dr. Parker volunteered to try to contact Dr. Durham to let him know of Dr. Corum's concerns. Dr. Parker did contact Dr. Durham later in the evening regarding Dr. Corum's concerns.

There is a material issue of fact in dispute as to whether at the 26 June meeting Dr. Corum refused to implement the move as per Dr. Durham's 21 June directive or whether he encouraged his staff to go ahead with the move. The defendants' position is that Dr. Corum announced at the meeting that he would not go through with the move until he could talk to Dr. Durham. Dr. Corum's account is that he did not resist the move and cooperated fully despite his misgivings about the decision. Dr. Corum actually physically helped in the packing and moving.

When Dr. Parker called Dr. Durham after the 26 June meeting, Dr. Durham responded by immediately returning to ASU. Dr. Durham met at 6:30 a.m. on 27 June with defendant Dr. Thomas, the Chancellor of ASU. At 8:30 a.m. Dr. Durham met with Dr. Corum and informed him that he was being removed from his deanship. There is no evidence that Dr. Durham gave Dr. Corum an opportunity to explain his proposal or to comment on the events of the previous day. Chancellor Thomas subsequently affirmed Dr. Durham's decision to remove Dr. Corum from his duties as Dean of Learning Resources. Dr. Corum has, however, retained his position as a tenured faculty member.

Plaintiff contends that defendants discharged him from his deanship in retaliation for his speaking freely about the moving of the Appalachian Collection. Plaintiff contends that Dr. Durham's concealment of the fact that the Collection was to be split was intended to make the move administratively easier by preventing

vocal opposition to the decision. When this "ruse" was discovered and exposed by Dr. Corum in his speaking out, defendants improperly removed him in retaliation for his speech. Plaintiff seeks damages and, among other things, reinstatement as Dean of Learning Resources as a result of this impermissible retaliatory removal.

It is defendants' position that the sole reason Dr. Corum was removed from his deanship was because he refused to carry out the move, and this insubordination justified his demotion.

Plaintiff filed a grievance proceeding with the University of North Carolina ("UNC") which resulted in a decision that Dr. Corum had failed to prove that his removal from the deanship was impermissibly based on his exercise of his right to freedom of speech. After this proceeding was completed Dr. Corum filed the instant case on 20 February 1987.

### I. 42 U.S.C. § 1983 CLAIMS

Plaintiff's complaint alleges:

> 24. In relieving plaintiff of his duties as Dean and in denying plaintiff salary increases in retaliation for plaintiff having exercised his First Amendment rights, defendants violated plaintiff's rights protected by the First and Fourteenth Amendments of the Constitution of the United States. Such acts are in violation of 42 U.S.C. § 1983.

Under 42 U.S.C. § 1983, plaintiff sought a preliminary and permanent injunction, additional equitable relief including reinstatement, promotion, and compensatory seniority, as well as monetary damages. Section 1983 provides in relevant part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding to redress.

42 U.S.C. § 1983 (1979). The law regarding the interpretation of section 1983 is labyrinthine; for purposes of clarity we discuss the law in terms of several subcategories.

CORUM v. UNIVERSITY OF NORTH CAROLINA

[330 N.C. 761 (1992)]

## A. ASU, UNC, and State Officials—Official Capacities

[1]  The text of section 1983 permits actions only against a "person." In *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 105 L. Ed. 2d 45 (1989), the Supreme Court held that when an action is brought under section 1983 in state court against the State, its agencies, and/or its officials acting in their official capacities, neither a State nor its officials acting in their official capacity are "persons" under section 1983 when the remedy sought is monetary damages.[1] *Accord Quern v. Jordan*, 440 U.S. 332, 59 L. Ed. 2d 358 (1979). Thus, under section 1983 plaintiff in the instant case is barred from seeking damages from UNC, ASU, Harvey Durham in his official capacity, Dr. Thomas in his official capacity, or C.D. Spangler in his official capacity.[2]

[2]  Notably however, when injunctive relief is being sought under section 1983 from State institutions or employees acting in their official capacities, such equitable actions are not barred. The *Will* court explained:

> Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because "official-capacity actions for prospective relief are not treated as actions against the State." *Kentucky v. Graham*, 473 U.S. at 167, n 14, 87 L Ed 2d 114, 105 S Ct 3099; *Ex parte Young*, 209 U.S. 123, 159-160, 52 L Ed 714, 28 S Ct 441 (1908).

*Will*, 491 U.S. at 71 n.10, 105 L. Ed. 2d at 58 n.10. Therefore, plaintiff's action against UNC, ASU, and the individual defendants sued in their official capacities for prospective equitable relief is not barred because in this context these defendants are "persons" reachable under section 1983.

---

1. *Kentucky v. Graham*, 473 U.S. 159, 165-67, 87 L. Ed. 2d 114, 121-22 (1985) (explaining official versus individual capacities).

2. While the Court of Appeals reaches this result it does so under the case of *Truesdale v. University of North Carolina*, 91 N.C. App. 186, 371 S.E.2d 503 (1988), *disc. rev. denied*, 323 N.C. 706, 377 S.E.2d 229 (1989), *cert. denied*, 493 U.S. 808, 107 L. Ed. 2d 19 (1989). Insofar as *Truesdale* states that section 1983 actions against state institutions are barred by the doctrine of sovereign immunity, it is overruled. *Martinez v. California*, 444 U.S. 277, 283, 62 L. Ed. 2d 481, 488 (1980) (sovereign immunity cannot bar liability in section 1983 actions filed in state courts); *accord Howlett v. Rose*, 496 U.S. ---, 110 L. Ed. 2d 332 (1990).

[3] In addition, under the federal cases interpreting section 1983, sovereign immunity alleged under state law is not a permissible defense to section 1983 actions. *Martinez v. California*, 444 U.S. 277, 283, 62 L. Ed. 2d 481, 488 (1980) (sovereign immunity cannot bar liability in section 1983 actions filed in state courts). The defense of qualified immunity is not available under section 1983 to one sued in his official capacity. *Brandon v. Holt*, 469 U.S. 464, 83 L. Ed. 2d 878 (1985).

Having determined that the equitable relief sought against the defendants in their official capacities is not barred under section 1983 and that the defenses of sovereign and qualified immunity are not available to defendants, the question then becomes whether plaintiff has made a sufficient forecast of evidence to repel defendant's motion for summary judgment. Before examining the factual basis set forth by plaintiff in this regard, we continue analysis of section 1983 and will treat the factual aspect below *in toto*.

## B. Durham and Thomas—Individual Capacities

[4] Under *Kentucky v. Graham*, 473 U.S. 159, 87 L. Ed. 2d 114 (1985), state governmental officials can be sued in their individual capacities for damages under section 1983. This holding was affirmed and applied in *Hafer v. Melo*, --- U.S. ---, --- L. Ed. 2d --- (Nov. 1991). This is because unlike a suit against a state official in his official capacity, which is basically a suit against the official office and therefore against the State itself, a suit against an individual who happens to be a governmental official but is not acting in his official capacity is not imputed to the State. Such individuals are sued as individuals, not as governmental employees. Presumably, they are personally liable for payment of any damages awarded. Under United States Supreme Court precedent, however, such officials sued as individuals may raise a defense of qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 73 L. Ed. 2d 396 (1982). The defendants in the instant case have raised this defense.

[5] *Harlow* sets forth an objective standard for determining whether qualified immunity will act as a bar to further litigation in a suit by providing that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

known." *Id.*, at 818, 73 L. Ed. 2d at 410.[3] This standard was set forth to allow determination of whether a qualified immunity defense bars further proceedings by means of a process of examining the law in existence at the time of the offense to determine whether it contained "clearly established . . . rights of which a reasonable person would have known." *Id.* By using the "reasonable person standard," the Supreme Court intended to avoid the necessity of an evidentiary consideration of whether a defendant raising the immunity defense, in fact, subjectively knew that his conduct toward plaintiff would violate plaintiff's constitutional rights. *Harlow*, 457 U.S. 800, 73 L. Ed. 2d 396 (citing *Wood v. Strickland*, 420 U.S. 308, 322, 43 L. Ed. 2d 214, 225 (1975) ). *Cf. Mitchell*, 472 U.S. 511, 526, 86 L. Ed. 2d 411, 425 (Qualified immunity, if available, provides "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.").

As a number of federal courts of appeal have observed, however, *Harlow's* "purely 'objective' test cannot in the end avoid the necessity to inquire into official motive or intent or purpose when such states of mind are essential elements of the constitutional right allegedly violated." *Collinson v. Gott*, 895 F.2d 994, 1001-02 (4th Cir. 1990) (Phillips, J., concurring) (citations omitted). *Accord, e.g., Stewart v. Baldwin County Bd. of Election*, 908 F.2d 1499 (11th Cir. 1990); *Morris v. Clifford*, 903 F.2d 574 (8th Cir. 1990); *Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642 (10th Cir. 1988). In other words, whether a qualified immunity defense is appropriate requires proof of an official's intent where the existence of a constitutional violation depends on proof of motivation. For example, as the Sixth Circuit Court of Appeals has written:

> [I]f a public employer terminates a black employee because he is black, that act clearly violates federal constitutional and statutory law. If, however, the employer terminates the black employee because of incompetence, then the discharge obviously does not violate the law at all. The act itself—the act of discharge—is neutral; it is the motive or intent that makes the act both actionable and violative of clearly established law.

---

3. Although *Harlow* did not concern the elements of qualified immunity available to state officials sued for constitutional violations under 42 U.S.C. § 1983, *see* 457 U.S. at 818 n.30, 73 L. Ed. 2d at 410 n.30, later cases apply the *Harlow* standard to state officials in this context.

*Poe v. Haydon*, 853 F.2d 418, 431 (6th Cir. 1988), *cert. denied*, --- U.S. ---, 102 L. Ed. 2d 780 (1989).

Similarly, in the instant case, if the defendants demoted Corum *because* of his exercise of free speech rights, such demotion clearly would violate federal law. If, however, he was demoted because of insubordination, the discharge may not violate the law at all. The act itself—the act of demotion—is neutral; it is the motive or intent that makes the act both actionable and violative of clearly established law. *Id.* Thus, in addition to *Harlow's* objective step— that is, a determination of whether at the time of the alleged act the law concerning the right was clearly established—we must also concern ourselves with the material issue of fact surrounding Dr. Durham's motive in demoting Corum. As explained below, we adopt the reasoning applied in the majority of federal circuit courts of appeal which have had to reconcile this issue with the objective test enunciated in *Harlow*. In brief, this approach holds that

> where the defendant's subjective intent is an element of the plaintiff's claim and the defendant has moved for summary judgment based on a showing of the objective reasonableness of his actions, the plaintiff may avoid summary judgment only by pointing to *specific evidence* that the officials' actions were improperly motivated.

*Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988) (emphasis supplied).

Under *Harlow*, the first question arising upon the defendants' motion for summary judgment is whether a reasonable official in each defendant's position could have believed that his actions were lawful in light of clearly established law at the time and in light of the information possessed by the official at the time the conduct occurred. *Harlow*, 457 U.S. 800, 73 L. Ed. 2d 396; *Anderson v. Creighton*, 483 U.S. 635, 642, 97 L. Ed. 2d 523, 532 (1987). The right that the officials allegedly violated must have been clearly established in a particularized sense: "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640, 97 L. Ed. 2d at 531. This is because "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow*, 457 U.S. at 818-19, 73 L. Ed. 2d at 411. *Accord Anderson*, 483 U.S. 635, 640 n.2, 97

CORUM v. UNIVERSITY OF NORTH CAROLINA

[330 N.C. 761 (1992)]

L. Ed. 2d 523, 530 n.2 Therefore, our focus is not upon the broad First Amendment right to speak freely in its most general or abstract sense, but upon its application to the particular conduct being challenged in the instant case. *Anderson*, 483 U.S. at 638-39, 97 L. Ed. 2d at 530; *Collinson*, 895 F.2d 994, 998 (4th Cir. 1990) (Phillips, J., concurring).

In the present case, this inquiry requires us to begin by examining the contours of a public employee's rights in June 1984 to speak without retaliation in his place of work. After this, we must ask (a) whether a reasonable vice chancellor (in the instant case, Dr. Durham) could have believed his actions were lawful in light of the information possessed by him at the time he demoted Dr. Corum, and (b) whether a reasonable chancellor (in the instant case, Dr. Thomas) could have believed that his or her actions in officially approving the demotion were lawful in light of clearly established law at the time and in light of the information possessed by him at the time he approved the demotion of Dr. Corum.

[6] As the United States Supreme Court explained in *Connick v. Myers*, "[f]or at least 15 years, it has been settled that a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick*, 461 U.S. 138, 142, 75 L. Ed. 2d 708, 716-17 (1983). However, in 1984 a public employee's right to speak was not absolute, nor is it today. Under *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 20 L. Ed. 2d 811, 817 (1968), a public employee's right to free speech is limited by the government's need to preserve efficient governmental functions. As a recent case explained, "[t]his balancing is necessary in order to accommodate the dual role of the public employer as a provider of public services and as a government entity operating under the constraints of the First Amendment." *Rankin v. McPherson*, 483 U.S. 378, 384, 97 L. Ed. 2d 315, 324 (1987).

A further limitation under *Pickering* is that only speech on a matter "of public concern" is constitutionally protected. *Pickering*, 391 U.S. at 568, 20 L. Ed. 2d at 817. To determine whether speech fits in this category, the Court examines the content, form, and context of the public employee's speech. Only if the speech was on a matter of public concern is the balancing test reached.

CORUM v. UNIVERSITY OF NORTH CAROLINA

[330 N.C. 761 (1992)]

**[7]** In the oral argument before this Court, although not in the briefs, counsel for defendants[4] contended that Dr. Corum's speech was not on a matter of public concern. Even though not at issue on this appeal, the record discloses that the question of what to do with the Appalachian Collection had been publicly debated on the campus and was a matter of public concern. Given that the speech at issue addressed a matter of public concern we return to the *Pickering* balancing test to determine whether in 1984 the free speech rights allegedly violated by defendants were clearly established when defendants acted.

In the *Pickering* analysis the manner, time, and place of the employee's expression are relevant, as is the context in which the speech occurred. *See Connick*, 461 U.S. 138, 75 L. Ed. 2d 708. *Accord, e.g., Rankin*, 483 U.S. at 388, 97 L. Ed. 2d at 327. Specifically, considerations such as whether the speech impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise are relevant in balancing the two competing interests. *Pickering*, 391 U.S. at 570-73, 20 L. Ed. 2d at 817-20.

**[8]** In the instant case, we conclude that Dr. Corum had a constitutionally protected right to speak out in 1984 in the manner alleged. While the speech may have affronted Dr. Durham, it cannot be said that the speech impeded Corum's duties or interfered with the regular operation of the University, particularly during the approximately eighteen-hour period between the time he spoke out and the time he was demoted, nor was the likelihood of such interference over a longer interval great given that Corum did not, as we must presume on a review of a denial of summary judgment, refuse to carry out Durham's instructions. Later, in fact, Dr. Corum participated in carrying out Dr. Durham's directive. Durham's action in effect preempted the possibility of interference with ongoing library functions since it removed Corum from the chain of command. Since Corum's speech clearly could not have affected and did not affect Durham's decision to move the Appalachian Collection, its danger to the organization was *de minimis*. Thus, we conclude, after having balanced competing interests, that

---

4. The Attorney General represented all defendants by virtue of N.C.G.S. § 143-300.2.

CORUM v. UNIVERSITY OF NORTH CAROLINA

[330 N.C. 761 (1992)]

Corum's interest in speaking out on this public issue outweighed any negative effect it might have had on the efficient functioning of ASU. The law was clearly established in 1984 that Corum had a right to speak out in the way alleged. See *Pickering*, 391 U.S. 563, 20 L. Ed. 2d 811. Whether a material question of fact exists as to whether Corum's demotion was constitutionally justified is discussed hereinafter.

[9] The next question then becomes whether a reasonable vice chancellor could have believed that demoting Dr. Corum was lawful in light of clearly established law and the information which he possessed at the time. *Anderson*, 483 U.S. at 643, 97 L. Ed. 2d at 532-33. For purposes of this analysis, Dr. Durham's subjective beliefs about the legality of the demotion are irrelevant. *Id.*

Where the "clearly established law" contains a subjective element, as in this case, of motive or intent, it is a part of the summary judgment analysis. While his subjective beliefs in this narrow respect are not relevant, an inquiry into Dr. Durham's motive or intent in demoting Corum is an unavoidable part of the process of determining whether a reasonable vice chancellor's actions here can be said to have violated Dr. Corum's First Amendment rights. This is so because if the motive was to suppress speech, one result is reached, while if the motive was to punish insubordination, another conclusion results. One problem this subjective analysis creates is a difficulty in deciding at summary judgment whether a qualified immunity defense is justified for the official whose conduct and motive are challenged. As one judge has explained:

> Vindication of immunity policies depends heavily upon the ability to dispose of insubstantial claims by resolving immunity questions at the earliest possible stages of a litigation, preferably on pleading or summary judgment motions. See *Mitchell*, 472 U.S. at 526, 105 S. Ct. at 2815. Questions of subjective states of mind are of course notoriously ill-adapted to summary resolution because of the ease with which they can be held at issue by conclusory allegations and conjectures in pleadings and discovery materials. *Harlow's* wholly "objective" test was adopted in large part to avoid this impediment to early resolution, by making irrelevant to the immunity inquiry any question of an official's "bad faith" or his purely subjective perceptions about a plaintiff's rights. See *Harlow*, 457 U.S. at 815-19, 102 S. Ct. at 2736-39. As several courts of appeals

have since recognized, however, the resulting purely "objective" test cannot in the end avoid the necessity to inquire into official motive or intent or purpose when such states of mind are essential elements of the constitutional right allegedly violated. *See, e.g., Pueblo Neighborhood Health Centers, Inc. v. Losavio,* 847 F.2d 642, 647-48 (10th Cir. 1988); *Musso v. Hourigan,* 836 F.2d at 743; *Gutierrez v. Municipal Court,* 838 F.2d 1031, 1050 n. 25 (9th Cir. 1988); *Martin v. D.C. Metropolitan Police Dept.,* 812 F.2d 1425, 1432 (D.C. Cir.), *holding vacated,* 817 F.2d 144 (D.C. Cir.), holding reinstated *sub nom. Bartlett ex rel. Neuman v. Bowen,* 824 F.2d 1240 (D.C. Cir. 1987).

As a result, as several of these courts also have recognized, there is a risk that in such cases the impediment to summary resolution that *Harlow* deliberately sought to remove could be reimposed. *See Pueblo,* 847 F.2d at 648; *Martin,* 812 F.2d at 1433. To minimize that risk, these courts have adopted a procedural approach designed to insure that meritorious immunity defenses can yet be established by summary judgment in such cases. Building on the Supreme Court's recent encouragement to proper usages of summary judgment in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986), and *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), the Tenth Circuit, for example, has held that

> [w]here the defendant's subjective intent is an element of the plaintiff's claim and the defendant has moved for summary judgment based on a showing of the objective reasonableness of his actions, the plaintiff may avoid summary judgment only by pointing to specific evidence that the officials' actions were improperly motivated.

*Pueblo,* 847 F.2d at 649; *see also Martin,* 812 F.2d at 1434.

*Collinson,* 895 at 1001-02 (4th Cir.) (Phillips, J. concurring). *Accord, e.g., Stewart,* 908 F.2d 1499 (11th Cir.).

This approach appropriately retains the *Harlow* "objective look" test with respect to the law applicable at the time of the alleged violation, but it also permits a plaintiff who has some proof of the alleged violation to attempt to convince the finder of fact that his allegations are correct. To foreclose this opportunity would

## CORUM v. UNIVERSITY OF NORTH CAROLINA

[330 N.C. 761 (1992)]

effectively prevent every plaintiff from recovering on a claim which has an element requiring a determination of subjective intent.

In the present case then, the immediate question becomes whether there was sufficient evidence before the trial judge that Dr. Durham's demotion of Dr. Corum was improperly motivated, justifying the denial of summary judgment.

In this regard, Dr. Durham testified that he had gone to Chapel Hill prior to 25 June and that Dr. Parker, who had been at the meeting when Dr. Corum made his remarks, telephoned him to report on that meeting. Dr. Parker told him that Dr. Corum had decided not to carry out the decision that had been made, and that Dr. Corum wanted to talk with him (Dr. Durham). Dr. Durham replied that the time for talking was over. He returned to Boone that night, contacted Chancellor Thomas, and met with Chancellor Thomas at 6:30 the next morning. All Dr. Durham had to rely upon in regard to Dr. Corum's position concerning the moving of the Collection was the short telephone conversation that he had the previous evening with Dr. Parker. At the 6:30 a.m. meeting with Chancellor Thomas, Dr. Durham made his recommendation to the Chancellor, and they agreed that Dr. Corum would be relieved of his responsibilities or given the opportunity to resign. Dr. Corum was relieved of his responsibilities as Dean of Learning Resources.

However, Dr. Parker's testimony as to the telephone communication with Dr. Durham was to the contrary. He testified:

> I told Harvey [Durham] that Bill Strickland and I had met with Al Corum, Judy Ball and Richard Barker, and that Al presented an alternative proposal and that he wanted to talk to Harvey about that before he would take any action regarding the Collection.

Q What was Dr. Durham's response?

A Well, I believe I asked him, "Do you want to talk to Dr. Corum?" And as well as I remember, his response was emphatic. He said, "Hell, no. The time for talking is over. I made my decision."

. . . .

Q And then, I believe, referring to the chronology there, you did have a meeting at 7:00 the next morning?

A Yes.

Q At that meeting at 7:00 did Dr. Durham inform you that he had just finished meeting with Chancellor Thomas, and he had decided to ask Dr. Corum to resign, and if Dr. Corum did not he was going to relieve him of his duties as Dean?

A Yes.

As to the 26 June meeting between Dr. Corum, Dr. Parker, and others, Parker testified:

Q Did you ever tell Dr. Durham in that meeting on June 26 that his desire to discuss the issue of how the move of—tell Dr. Corum that his desire to discuss the hows and whys of the move of the Appalachian Collection further with Dr. Durham or to discuss it at some point with Dr. Thomas would be insubordination?

A I certainly did not.

　. . . .

Q You just answer the question, Dr. Parker. Now, what do you recall him actually saying?

A That he would not continue with it [dealing with the Appalachian Collection] until he had a chance to talk to Dr. Durham.

The effect of the proposed move on the Collection had been the subject of public debate on the campus. It was Dr. Corum's chief interest to keep the entire Collection intact when it was moved. However, the evidence also showed that Dr. Durham did not advise Dr. Corum that the Collection would be split up when he told Corum that it would be moved. The 21 June 1984 memorandum from Durham to Corum stated: "Further, the Appalachian Collection will be physically housed in University Hall," leading Corum to believe that the entire Collection would be together. In fact, Durham had already decided to split the Collection, the artifacts to be stored in the basement of another building. Thus, the 21 June memo becomes the "smoking gun," revealing the effort to deceive Dr. Corum until it was too late for public protests. Dr. Alvis L. Corum's deposition, exhibit 2.

The evidence before the trial court on the motion for summary judgment was sufficient to raise a material question of fact as

CORUM v. UNIVERSITY OF NORTH CAROLINA

[330 N.C. 761 (1992)]

to the motive of Dr. Durham in demoting Dr. Corum. Dr. Durham's evidence indicates his motive was to promote discipline and efficient administration of ASU; Corum's evidence indicates that Dr. Durham's motive was to stifle debate over the issue, to carry out his decision to split the Collection quickly, as well as to improperly punish Dr. Corum. We hold that plaintiff has presented sufficient specific evidence of improper motive to defeat defendant Durham's motion for summary judgment. *See Collinson*, 895 F.2d 994 (4th Cir.) (Phillips, J. concurring).

Upon the foregoing findings and conclusions, we hold that defendant Durham's motion for summary judgment based upon the defense of qualified immunity to plaintiff's 42 U.S.C. § 1983 claims was properly denied by the trial judge. The Court of Appeals erred in reversing the trial court's order denying defendant Durham's motion for summary judgment.

[10] Plaintiff has failed to present a forecast of evidence as to any improper action or motive by ASU, UNC, President Spangler or Chancellor Thomas; therefore, the motion for summary judgment should have been allowed as to these defendants on all of plaintiff's 42 U.S.C. § 1983 claims.

## II. STATE CONSTITUTIONAL CLAIMS

The Court of Appeals properly reversed the trial court's denial of summary judgment regarding plaintiff's state constitutional claims against defendants ASU, UNC, and President Spangler and Chancellor Thomas acting in their official capacities. However, as later discussed, the Court of Appeals erred in relying upon the doctrine of sovereign immunity in so deciding. The Court of Appeals erred in reversing the trial court on this issue as to defendant Durham.

[11] This issue brings forward the question of whether a plaintiff has a direct cause of action under the State Constitution against governmental defendants for alleged violations of the plaintiff's free speech rights.

Our Constitution states: "*Freedom of speech and Press.* Freedom of speech and of the press are two of the great bulwarks of liberty and therefore shall never be restrained, but every person shall be held responsible for their abuse." N.C. Const. art. I, § 14. The words "shall never be restrained" are a direct personal guarantee of each citizen's right of freedom of speech.

In *Midgett v. Highway Commission*, this Court held:

> Our Constitution, Article I, section 17, guarantees payment of compensation for property taken by sovereign authority. . . . A constitutional prohibition against taking or damaging private property for public use without just compensation is self-executing, and neither requires any law for its enforcement nor is susceptible of impairment by legislation. And where the Constitution points out no remedy and no statute affords an adequate remedy under a particular fact situation, the common law will furnish the appropriate action for adequate redress of such grievance.

*Midgett,* 260 N.C. 241, 249-50, 132 S.E.2d 599, 608 (1963) (citing *Sale v. Highway Commission*, 242 N.C. 612, 89 S.E.2d 290 (1955)). Therefore, in the absence of an adequate state remedy, one whose state constitutional rights have been abridged has a direct claim against the State under our Constitution. The provision of our Constitution which protects the right of freedom of speech is self-executing. *See Sale*, 242 N.C. 612, 89 S.E.2d 290. Therefore, the common law, which provides a remedy for every wrong, will furnish the appropriate action for the adequate redress of a violation of that right. *Id.*

This great bulwark of liberty is one of the fundamental cornerstones of individual liberty and one of the great ordinances of our Constitution. Freedom of speech is equal, if not paramount, to the individual right of entitlement to just compensation for the taking of property by the State. *Flake v. News Co.*, 212 N.C. 780, 790, 195 S.E. 55, 62 (1938). Certainly, the right of free speech should be protected at least to the extent that individual rights to possession and use of property are protected. *Id.* A direct action against the State for its violations of free speech is essential to the preservation of free speech.

The civil rights guaranteed by the Declaration of Rights in Article I of our Constitution are individual and personal rights entitled to protection against state action under the rationale adopted in the above-cited authorities. The Declaration of Rights was passed by the Constitutional Convention on 17 December 1776, the day before the Constitution itself was adopted, manifesting the primacy of the Declaration in the minds of the framers. The fundamental purpose for its adoption was to provide citizens with protection from the State's encroachment upon these rights. Encroachment

## CORUM v. UNIVERSITY OF NORTH CAROLINA

[330 N.C. 761 (1992)]

by the State is, of course, accomplished by the acts of individuals who are clothed with the authority of the State. The very purpose of the Declaration of Rights is to ensure that the violation of these rights is never permitted by anyone who might be invested under the Constitution with the powers of the State. *State v. Manuel*, 20 N.C. 144 (1838).

In *Trustees of the University of North Carolina v. Foy*, 5 N.C. 57 (1805), the Court recognized the supremacy of rights protected in Article I and indicated that it would only apply the rules of decision derived from the common law and such acts of the legislature that are consistent with the Constitution. This Court is the ultimate interpreter of our State Constitution. *Bayard v. Singleton*, 1 N.C. (Mart.) 5 (1787).

It is the state judiciary that has the responsibility to protect the state constitutional rights of the citizens; this obligation to protect the fundamental rights of individuals is as old as the State. *King v. South Jersey Nat. Bank*, 66 N.J. 161, 330 A.2d 1 (1974). Our Constitution is more detailed and specific than the federal Constitution in the protection of the rights of its citizens. *Lamb v. Wedgewood South Corp.*, 308 N.C. 419, 302 S.E.2d 868 (1983); Chief Justice James G. Exum, Jr., *Dusting Off Our State Constitution*, 33 State Bar Quarterly, No. 2 6-8 (1986). We give our Constitution a liberal interpretation in favor of its citizens with respect to those provisions which were designed to safeguard the liberty and security of the citizens in regard to both person and property. *State v. Harris*, 216 N.C. 746, 6 S.E.2d 854 (1939).

This Court has recognized a direct action under the State Constitution against state officials for violation of rights guaranteed by the Declaration of Rights. *Sale*, 242 N.C. 612, 89 S.E.2d 290. Having no other remedy, our common law guarantees plaintiff a direct action under the State Constitution for alleged violations of his constitutional freedom of speech rights. *Id.* We conclude that plaintiff does have a direct cause of action under the State Constitution against defendant Durham in his official capacity for alleged violations of plaintiff's free speech rights.

The authorities in North Carolina are consistent with the decisions of the United States Supreme Court and decisions of other state supreme courts to the effect that officials and employees of the State acting in their official capacity are subject to direct causes of action by plaintiffs whose constitutional rights have been

violated. *See, e.g., Bivens v. Six Unknown Agents*, 403 U.S. 388, 29 L. Ed. 2d 619 (1971); *Bagg v. University of Tex. Medical Branch*, 726 S.W.2d 582 (Tex. Ct. App. 1987); *Widgeon v. Eastern Shore Hosp. Ctr.*, 300 Md. 520, 479 A.2d 921 (1984); *Phillips v. Youth Dev. Programs, Inc.*, 390 Mass. 652, 459 N.E.2d 453 (1983); *Schreiner v. McKenzie, Tank Lines & Risk Management Servs., Inc.*, 408 So.2d 711 (Fla. Dist. Ct. App. 1982), *approved Schreiner v. McKenzie Tank Lines, Inc.*, 432 So.2d 567 (Fla. 1983); *Fenton v. Groveland Community Servs. Dist.*, 135 Cal. App. 3d 797, 185 Cal. Rptr. 758 (1982); *Lloyd v. Stone Harbor*, 179 N.J. Super. 496, 432 A.2d 572 (1981); *Peper v. Princeton Univ. Bd. of Trustees*, 77 N.J. 55, 389 A.2d 465 (1978); *Walinski v. Morrison and Morrison*, 60 Ill. App. 3d 616, 377 N.E.2d 242 (1978). In *Laguna Publishing Co. v. Golden Rain Found*, 131 Cal. App. 3d 816, 182 Cal. Rptr. 813 (1982), the court allowed damages for violations of plaintiff's constitutional free speech rights.

[12] As stated, the common law provides a remedy for the violation of plaintiff's constitutionally protected right of free speech. What that remedy will require, if plaintiff is successful at trial, will depend upon the facts of the case developed at trial. It will be a matter for the trial judge to craft the necessary relief. As the evidence in this case is not fully developed at this stage of the proceedings, it would be inappropriate for this Court to attempt to establish the redress recoverable in the event plaintiff is successful; however, such redress could consist of, *inter alia*, reinstatement to his prior status or a comparable status, with or without any loss of wages. Various rights that are protected by our Declaration of Rights may require greater or lesser relief to rectify the violation of such rights, depending upon the right violated and the facts of the particular case. When called upon to exercise its inherent constitutional power to fashion a common law remedy for a violation of a particular constitutional right, however, the judiciary must recognize two critical limitations. First, it must bow to established claims and remedies where these provide an alternative to the extraordinary exercise of its inherent constitutional power. *In re Alamance County Court Facilities*, 329 N.C. 84, 100-01, 405 S.E.2d 125, 133 (1991) (discussing and applying inherent powers of the judiciary). Second, in exercising that power, the judiciary must minimize the encroachment upon other branches of government — in appearance and in fact — by seeking the least intrusive remedy available and necessary to right the wrong. *Id.*

CORUM v. UNIVERSITY OF NORTH CAROLINA

[330 N.C. 761 (1992)]

In *Sale*, we concluded: "[W]hen a person has been deprived of his private property for public use nothing short of actual payment, or its equivalent, constitutes just compensation. The entry of a judgment is not sufficient." *Sale*, 242 N.C. at 618, 89 S.E.2d at 296. Our conclusion there, however, was dictated by the absence of any other adequate remedy and the fact that, in *Sale*, we were unable to fashion a common law remedy less intrusive than money damages which would correct the State's violation of the plaintiff's particular constitutional right at issue. *Id.*

[13]  Having determined that there is a direct claim against the State under the Declaration of Rights for the protection of plaintiff's free speech rights, we turn to the question of the relevance of the doctrine of sovereign immunity. The doctrine of sovereign immunity is judge-made in North Carolina and was first adopted by the North Carolina Supreme Court in *Moffitt v. Asheville*, 103 N.C. 237, 9 S.E. 695 (1889). A brief history of the doctrine is found in *Steelman v. City of New Bern*, 279 N.C. 589, 184 S.E.2d 239 (1971). The doctrine originated with the feudal concept that the king could do no wrong and culminated with its judicial recognition in the English case of *Russell v. Men of Devon*, 2 T.R. 667, 100 Eng. Rep. R. 359 (1788). North Carolina adopted the common law of England as it existed in 1776. Sovereign immunity was not a part of the common law of England at that time because the holding of *Men of Devon* with respect to sovereign immunity was not promulgated until 1788. Accordingly, early North Carolina decisions expressly rejected the doctrine. *Steelman*, 279 N.C. 589, 184 S.E.2d 239. Only with the *Moffitt* decision was sovereign immunity made a part of our law. It is, nevertheless, firmly established in the law of our State today and has been recognized by the General Assembly as the public policy of the State. The doctrine of sovereign immunity has been modified, but never abolished. It has been said that the present day doctrine seems to rest on a respect for the positions of two coequal branches of government—the legislature and the judiciary. Thus, courts have deferred to the legislature the determination of those instances in which the sovereign waives its traditional immunity.

However, in determining the rights of citizens under the Declaration of Rights of our Constitution, it is the judiciary's responsibility to guard and protect those rights. The doctrine of sovereign immunity cannot stand as a barrier to North Carolina citizens who seek to remedy violations of their rights guaranteed by the Declara-

tion of Rights. It would indeed be a fanciful gesture to say on the one hand that citizens have constitutional individual civil rights that are protected from encroachment actions by the State, while on the other hand saying that individuals whose constitutional rights have been violated by the State cannot sue because of the doctrine of sovereign immunity.

It is also to be noted that individual rights protected under the Declaration of Rights from violation by the State are constitutional rights. Such constitutional rights are a part of the supreme law of the State. *Ex rel. Martin v. Preston*, 325 N.C. 438, 385 S.E.2d 473 (1989). On the other hand, the doctrine of sovereign immunity is not a constitutional right; it is a common law theory or defense established by this Court as hereinabove set forth. Thus, when there is a clash between these constitutional rights and sovereign immunity, the constitutional rights must prevail.

Furthermore, this Court has long held that when public officials invade or threaten to invade the personal or property rights of a citizen in disregard of law, they are not relieved from responsibility by the doctrine of sovereign immunity even though they act or assume to act under the authority and pursuant to the directions of the State. *Lewis v. White*, 287 N.C. 625, 216 S.E.2d 134 (1975), *superceded on other grounds by statute as stated in, State v. Williams and Hessee*, 53 N.C. App. 674, 281 S.E.2d 721 (1981); *Schloss v. Highway Commission*, 230 N.C. 489, 53 S.E.2d 517 (1949). *Accord Shingleton v. State*, 260 N.C. 451, 133 S.E.2d 183 (1963); *Teer v. Jordan*, 232 N.C. 48, 59 S.E.2d 359 (1950); *Pue v. Hood, Comr. of Banks*, 222 N.C. 310, 22 S.E.2d 896 (1942). Indeed, that is the very harm that the people sought to thwart by adopting the Declaration of Rights.

This, of course, does not mean that defendant has no defense to the action. Durham is entitled to all defenses that may arise upon the facts and law of the case.

For the foregoing reasons, we hold that plaintiff does have a direct cause of action under the State Constitution for alleged violations of his freedom of speech rights, guaranteed by Article I, Section 14.

[14] We turn now to Thomas and Durham's petition for discretionary review of the decision of the Court of Appeals holding that defendants' motion for summary judgment as to plaintiff's

## CORUM v. UNIVERSITY OF NORTH CAROLINA

[330 N.C. 761 (1992)]

claims for monetary damages against Thomas and Durham, sued in their individual capacities, for alleged violations of plaintiff's constitutional free speech rights was properly denied by the trial court. By allowing this petition, we are now faced with the first impression issue of whether North Carolina recognizes a direct cause of action for monetary damages under the North Carolina Constitution against persons, sued only in their individual capacities, who allegedly violated a plaintiff's constitutional rights of freedom of speech. We answer the issue in the negative and hold that North Carolina does not recognize this cause of action.

In deciding this issue, the Court of Appeals made no analysis as to whether plaintiff had a direct cause of action against Thomas and Durham in their individual capacities, but only held that the doctrine of sovereign immunity did not bar plaintiff's claim. We begin with an analysis of whether plaintiff has such direct action against these defendants sued in their individual capacities.

The Declaration of Rights was adopted by the people in 1776 in order to affirmatively reserve the rights of the people as well as to protect those rights from encroachment by the State. *State v. Ballance*, 229 N.C. 764, 51 S.E.2d 731 (1949). In 1776 when the people of North Carolina established the State of North Carolina, they clearly and affirmatively set forth certain fundamental human rights which their government was bound to respect. Through the Declaration of Rights, the people of North Carolina secured these rights against state officials and shifting political majorities. The Declaration of Rights, Article I, Section 35 states: "A frequent recurrence to fundamental principles is absolutely necessary to preserve the blessings of liberty." N.C. Const. art. I, § 35. With that in mind, this Court considers the purpose for the Declaration of Rights, the language of Article I, Section 14, as well as the function and traditional role of the courts in North Carolina's constitutional democracy. The Declaration of Rights was intended to protect individual rights from infringement by the State. To that end, the Declaration of Rights expresses the rights it guarantees in clear and explicit language.

As a matter of fundamental jurisprudence the Constitution itself does not recognize or create rights which may be asserted against individuals. Instead, the Constitution is the instrument by which "We, the people of the State of North Carolina," first acknowledge our individual rights and liberties and then create

a government to better secure our enjoyment of those rights and liberties. The significant fact is that "We, the people," created the Constitution and the government of our State in order to limit our actions as the body politic. The Constitution is intended to protect our rights as individuals from our actions as the government. The Constitution is not intended to protect our rights vis-a-vis other individuals.

From its earliest days, this Court has noted this essential feature of the Constitution. In *Hoke v. Henderson*, 15 N.C. 1 (1833), then Chief Justice Ruffin, writing for the Court, expounded on the nature of constitutional government. Among many of the points relevant to this issue, Chief Justice Ruffin stated:

> In America, written Constitutions, conferring and dividing the powers of government, and restraining the actions of those in authority, for the time being, have been established as securities of public liberty and private right.
>
> .  .  .  .
>
> It is true, the whole community may modify the rights which persons can have in things, or at their pleasure, abolish them altogether. But when the community allows the right and declares it to exist, that constitution is the freest and best, which forbids the *government* to abolish the right, or which restrains the *government* from depriving a particular citizen of it. In other words, *public liberty requires that private property should be protected even from the government itself.*

*Id.* at 9, 12 (emphasis added). In light of the purpose and language of the Constitution, plaintiff cannot rely on the Constitution to support a claim for money damages against individuals, acting in their personal capacities for the alleged violation of freedom of speech rights recognized under the Constitution. The Constitution only recognizes and secures an individual's rights vis-a-vis "We, the people of the State of North Carolina," not individual members of that body politic. Of course, the State may only act through its duly elected and appointed officials. Consequently, it is the state officials, acting in their official capacities, that are obligated to conduct themselves in accordance with the Constitution. Therefore, plaintiff may assert his freedom of speech right only against state officials, sued in their official capacity.

**CORUM v. UNIVERSITY OF NORTH CAROLINA**

[330 N.C. 761 (1992)]

Although plaintiff's counsel at oral argument candidly admitted that plaintiff only sought relief against Thomas and Durham sued in their official status, we deemed it necessary to discuss the issue. We hold that plaintiff has no direct cause of action against Thomas or Durham sued in their *individual capacities* for alleged violations of plaintiff's constitutional freedom of speech rights. We reverse the Court of Appeals' holding to the contrary as to this issue.

[15] We conclude that the Court of Appeals erred in applying the defense of sovereign immunity to plaintiff's claims under the State Constitution. However, plaintiff has failed to present a forecast of evidence sufficient to defeat the motion for summary judgment on behalf of ASU, UNC, President Spangler, and Chancellor Thomas as to plaintiff's state constitutional claims. Thus, the result reached by the Court of Appeals as to those defendants is affirmed. Plaintiff has, however, presented a sufficient forecast of evidence as to defendant Durham, sued in his official capacity, on this issue; therefore, the decision of the Court of Appeals as to Durham is reversed.

This holding completes the analysis of possible causes of action. Under section 1983, plaintiff has causes of action for:

1. Equitable relief against defendant Durham sued in his official capacity; and

2. Monetary damages against defendant Durham sued in his *individual* capacity.

Under the State Constitution, plaintiff has a direct cause of action against defendant Durham sued in his official capacity.

Thus, under 42 U.S.C. § 1983, plaintiff can only obtain prospective equitable relief against Durham sued in his official capacity and monetary damages against Durham sued in his individual capacity. Plaintiff cannot recover monetary damages under section 1983 against Durham sued in his official capacity. Therefore, plaintiff's right to sue Durham in his official capacity under the State Constitution completes his remedies. Plaintiff is not required to elect now, at summary judgment, among his remedies. N.C.G.S. § 1A-1, Rule 18(a), (e)(2) (1983).

The decision of the Court of Appeals is affirmed in part, reversed in part, and the cause is remanded to the Court of Appeals

for further remand to the Superior Court, Watauga County, for further proceedings not inconsistent with this opinion.

Affirmed in part, reversed in part, and remanded.

Justice WEBB dissents.