ELMORE, Judge.
 

 *497
 
 Following termination from her employment, Denise Malloy Hubbard (plaintiff) filed a complaint on 12 November 2014 against North Carolina State University (NCSU) and Anita Stallings (Stallings) in her official and individual capacities (collectively defendants). Plaintiff appeals from the trial court's 7 October 2015 award of summary judgment in favor of defendants. We affirm.
 

 I. Background
 

 In October 2004, plaintiff began working as the Director of Development in the College of Physical and Mathematical Sciences, which became the College of Sciences in July 2013. Throughout plaintiff's employment at NCSU, Stallings was plaintiff's direct supervisor. Toward the end of 2013, plaintiff began to report alleged misconduct by Stallings. Such reporting formed the basis of plaintiff's lawsuit.
 

 On 24 April 2014, Dan O'Brien, Senior Employee Relations Strategic Partner, and Stallings met with plaintiff and gave her a letter signed by Warwick A. Arden, Provost and Executive Vice Chancellor, which stated that her at-will employment with NCSU would be terminated, effective 24 July 2014. Subsequently, plaintiff filed a complaint in Wake County Superior Court on 12 November 2014, alleging (1) a violation of the North Carolina Whistleblower Act against NCSU and Stallings in her individual and official capacities; (2) wrongful termination in violation of public policy against NCSU and Stallings in her official capacity; (3) tortious
 
 *498
 
 interference with contract against Stallings in her individual capacity; and (4) a direct constitutional claim against NCSU and Stallings in her official and individual capacities.
 

 On 13 January 2015, defendants filed an answer and motion to dismiss pursuant to Rules 12(b)(1), (2), and (6) of our Rules of Civil Procedure. On 7 April 2015, the trial court entered an order granting defendants' motion to dismiss plaintiff's claim for wrongful termination in violation of public policy. The trial court denied defendants' motion with respect to plaintiff's other three claims. Subsequently, on 5 August 2015, defendants filed a motion for summary judgment. After a hearing, the trial court entered an order on 7 October 2015 granting defendants' motion for summary judgment on plaintiff's remaining three claims. Plaintiff appeals from that order.
 

 II. Analysis
 

 "The standard of review for summary judgment is
 
 de novo.
 
 "
 
 Forbis v. Neal,
 

 361 N.C. 519
 
 , 524,
 
 649 S.E.2d 382
 
 , 385 (2007) (citation omitted). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen.Stat. § 1A-1, Rule 56(c) (2015). "The trial court may not resolve issues of fact and must deny the motion if there is a genuine issue as to any material fact."
 
 Forbis,
 

 361 N.C. at 524
 
 ,
 
 649 S.E.2d at
 
 385 (citing
 
 Singleton v. Stewart,
 

 280 N.C. 460
 
 , 464,
 
 186 S.E.2d 400
 
 , 403 (1972) ). "A party moving for summary judgment may prevail if it meets the burden (1) of proving an essential element of the opposing party's claim is nonexistent, or (2) of showing through discovery that the opposing party cannot produce evidence to support an essential element of his or her claim."
 
 City of Thomasville v. Lease-Afex, Inc.,
 

 300 N.C. 651
 
 , 654,
 
 268 S.E.2d 190
 
 , 193 (1980) (citations omitted).
 

 A. North Carolina Whistleblower Act Claim
 

 In order to maintain a claim under the North Carolina Whistleblower Act, N.C. Gen.Stat. § 126-84,
 
 et seq.
 

 ,
 
 a plaintiff must prove by a preponderance of the evidence the following three elements: "(1) that the plaintiff engaged in a protected activity, (2) that the defendant took adverse action against the
 
 *918
 
 plaintiff in his or her employment, and (3) that there is a causal connection between the protected activity and the adverse action taken against the plaintiff."
 
 Newberne v. Dep't of Crime Control & Pub. Safety,
 

 359 N.C. 782
 
 , 788,
 
 618 S.E.2d 201
 
 , 206 (2005).
 
 *499
 
 N.C. Gen.Stat. § 126-84(a) (2015) states,
 

 (a) It is the policy of this State that State employees shall be encouraged to report verbally or in writing to their supervisor, department head, or other appropriate authority, evidence of activity by a State agency or State employee constituting:
 

 (1) A violation of State or federal law, rule or regulation;
 

 (2) Fraud;
 

 (3) Misappropriation of State resources;
 

 (4) Substantial and specific danger to the public health and safety; or
 

 (5) Gross mismanagement, a gross waste of monies, or gross abuse of authority.
 

 Here, plaintiff alleged that she reported protected activity as follows: On 2 December 2013, plaintiff met with NCSU Human Resources representatives Alicia Robinson (now Alicia Lecceardone) and Joyce Stevens, and reported the following concerns: accounting irregularities involving transfers of donor funds, which Stallings authorized, from restricted endowments to an unrestricted endowment; Stallings' extravagant personal expenses funded by unrestricted accounts; nepotism by Stallings; age and gender discrimination by NCSU and Stallings; EPA (Exempt from the State Personnel Act) designations for employees performing under SPA (Subject to the State Personnel Act) descriptions; and fear of retaliation by Stallings for reporting such concerns. On 6 January 2014, plaintiff met with Lecceardone and Ursula Hairston, Assistant Vice Provost for Equal Opportunity in the Office for Institutional Equity and Diversity (OIED), to discuss the same concerns she raised during the 2 December 2013 meeting. The following day, on 7 January 2014, plaintiff met with Cecile Hinson, Director of Internal Audit (IA), and Leo Howell, Assistant Director of IA at the time, and alleged that Stallings had improperly transferred donor funds among accounts, incurred excessive travel expenses, and extravagantly spent donor funds. IA commenced a thorough investigation, and it concluded in a final report that plaintiff's allegations could not be substantiated.
 

 Assuming that plaintiff reported protected activity, the trial court properly granted summary judgment in favor of defendants because plaintiff cannot produce evidence to support an essential element of
 
 *500
 
 her claim, causal connection.
 
 [1]
 
 Relevant here, a plaintiff may seek to establish a causal connection between the protected activity and adverse employment action through "circumstantial evidence that the adverse employment action was retaliatory and that the employer's proffered explanation for the action was pretextual."
 
 Newberne,
 

 359 N.C. at 790
 
 ,
 
 618 S.E.2d at 207
 
 (citation omitted). Such cases are commonly referred to as "pretext" cases.
 

 Id.
 

 Or, "when the employer claims to have had a good reason for taking the adverse action but the employee has direct evidence of a retaliatory motive, a plaintiff may seek to prove that, even if a legitimate basis for discipline existed, unlawful retaliation was nonetheless a substantial causative factor for the adverse action taken."
 
 Id.
 
 at 791,
 
 618 S.E.2d at 208
 
 (citation and quotations omitted). Such cases are commonly referred to as "mixed-motive" cases.
 

 Id.
 

 (citations and quotations omitted).
 

 Here, plaintiff claims that she has direct evidence of a retaliatory motive and this case is, therefore, governed by the "mixed-motive" analysis. The "direct evidence" required in a mixed-motive case has been defined as "evidence of conduct or statements that both reflect directly the alleged [retaliatory] attitude and that bear directly on the contested employment decision."
 
 Id.
 
 at 792,
 
 618 S.E.2d at 208-09
 
 (citation omitted). Because plaintiff has failed to present any direct evidence of a retaliatory motive, a mixed-motive analysis is not appropriate.
 

 *919
 
 Alternatively, plaintiff also claims that circumstantial evidence establishes that the adverse action was retaliatory under the "pretext" analysis and the burden shifting schemes developed by the Supreme Court in
 
 McDonnell Douglas Corporation v. Green,
 

 411 U.S. 792
 
 ,
 
 93 S.Ct. 1817
 
 ,
 
 36 L.Ed.2d 668
 
 (1973) and
 
 Texas Department of Community Affairs v. Burdine,
 

 450 U.S. 248
 
 ,
 
 101 S.Ct. 1089
 
 ,
 
 67 L.Ed.2d 207
 
 (1981). The
 
 Newberne
 
 Court described the analysis as follows:
 

 Under the
 
 McDonnell Douglas/Burdine
 
 proof scheme, once a plaintiff establishes a prima facie case of unlawful retaliation, the burden shifts to the defendant to articulate a lawful reason for the employment action at issue.
 
 See
 

 Burdine,
 

 450 U.S. at 252-53
 
 , [
 
 101 S.Ct. at 1093
 
 ],
 
 67 L.Ed.2d at
 
 215 (citing
 
 McDonnell Douglas,
 

 411 U.S. at 802
 
 , [
 
 93 S.Ct. at 1824
 
 ],
 
 36 L.Ed.2d at
 
 677-78 ). If the defendant meets this burden of production, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered explanation is pretextual.
 

 Id.
 

 (citing
 
 *501
 

 McDonnell Douglas,
 

 411 U.S. at 804
 
 , [
 
 93 S.Ct. at 1825
 
 ],
 
 36 L.Ed.2d at
 
 679 ). The ultimate burden of persuasion rests at all times with the plaintiff.
 

 Id.
 

 Newberne,
 

 359 N.C. at 791
 
 ,
 
 618 S.E.2d at 207-08
 
 .
 

 "[U]nder the
 
 McDonnell Douglas/Burdine
 
 burden-shifting proof scheme, in order to survive summary judgment, Plaintiff would have to raise a factual issue regarding whether these proffered reasons for firing Plaintiff were pretextual."
 
 Manickavasagar v. N.C. Dep't of Pub. Safety,
 

 238 N.C.App. 418
 
 , 429,
 
 767 S.E.2d 652
 
 , 659 (2014). " 'To raise a factual issue regarding pretext, the plaintiff's evidence must go beyond that which was necessary to make a
 
 prima facie
 
 showing by pointing to specific, non-speculative facts which discredit the defendant's non-retaliatory motive.' "
 
 Id.
 
 at 430,
 
 767 S.E.2d at 659
 
 (quoting
 
 Wells v. N.C. Dep't of Corr.,
 

 152 N.C.App. 307
 
 , 317,
 
 567 S.E.2d 803
 
 , 811 (2002) ).
 

 Plaintiff argues that defendants' alleged reasons for terminating her employment were pretextual because she was meeting development goals; she followed Stallings' direction on fundraising; she received no coaching or mentoring related to alleged low performance; she did not incur unexpected or excessive absences or tardiness; and she did not engage in inappropriate communications, create divisions, or behave disrespectfully. Plaintiff's argument hinges on her belief that Stallings personally decided to terminate plaintiff's employment on 21 March 2014, following Stallings' 19 March 2014 interview with IA and the fact that Stallings cancelled a meeting on 20 March 2014, citing a personnel issue.
 

 Defendants argue, "Plaintiff's suspicions about when Stallings began discussing Plaintiff's discontinuation with HR are irrelevant; the affidavits, exhibits and deposition testimony supporting Defendants' motion for summary judgment indicate that the process began long before the cancelled meeting [.]" Defendants contend that "Stallings had absolutely no knowledge" about plaintiff's reports, and plaintiff's "conclusory allegations and unsupported speculation are insufficient to discredit Defendants' legitimate non-retaliatory explanation for Plaintiff's discontinuation[.]" Defendants maintain that "[p]laintiff was discontinued as a result of her failure to meet performance goals and pattern of unprofessional conduct over a significant period of time[.]"
 

 Assuming that plaintiff can establish a
 
 prima facie
 
 case of unlawful retaliation, defendants have met their burden of articulating a lawful reason for the employment action at issue. Plaintiff cannot meet
 
 *502
 
 her burden of demonstrating that defendants' proffered explanation is pretextual.
 
 Newberne,
 

 359 N.C. at 791
 
 ,
 
 618 S.E.2d at 207-08
 
 . Here, the record evidence shows that Stallings expressed dissatisfaction with plaintiff's job performance and behavior in the workplace for around eighteen months before officially recommending that NCSU discontinue her employment. Plaintiff's own statements reveal that issues had been ongoing since the summer of 2012. Stallings repeatedly discussed the issues with Human Resources and the Dean of the College of Sciences, and allowed a time period for possible improvement, to no avail.
 
 *920
 
 Stallings' "Documentation of Issues with Denise Hubbard" detailed with specificity numerous problem areas, including,
 
 inter alia,
 
 plaintiff's low performance, unacceptable behavior with team members as well as other staff and donors, resistance in taking direction particularly involving directives to focus on individual giving as opposed to corporate fundraising, failure to engage in "quality" visits and properly record such visits, decision to implement her own agenda rather than the agenda set by the Dean, failure to timely submit contact reports, decision to inform a donor about a committee that had not been approved regarding a fund that she had been told was not "high priority," and attempting to undermine Stallings' authority in front of other staff members.
 

 Jo-Ann Cohen, Associate Dean for Academic Affairs in the College of Sciences, averred that she felt plaintiff was the source of dissension between the Office of Diversity and Student Services, and the Advancement Office. During the fall of 2013, she informed Daniel Solomon, then Dean of the College of Sciences, and O'Brien of her concerns and belief that plaintiff's actions were creating a divisive atmosphere across the Academic Affairs and Advancement units. Solomon's and O'Brien's affidavits confirm that Cohen reported such concerns at that time. Cohen also averred that Stallings told her that plaintiff's employment was going to be discontinued before Stallings learned that the Office of Advancement would be audited, and Stallings believed it was only a routine audit.
 

 In Lecceardone's affidavit, she stated that during the 2 December 2013 meeting with plaintiff and Stevens, plaintiff shared concerns about her salary being less than that of younger male co-workers, and she mentioned that she had received poor annual reviews from Stallings even though she was "making her numbers." Plaintiff gave Lecceardone a packet of notes at the meeting, outlining her concerns. In plaintiff's packet of notes, under "Exclusions," she stated that she helped create the Alumni and Friends Advisory Board, SCOPE Academy, and ACCESS Day, but when Marla Gregg was hired, Gregg was given responsibility
 
 *503
 
 for all three. Under "Additional," she stated that in the past two years, she had been excluded from events with donors, luncheons to introduce new department heads, and prospect strategy sessions for events. She also noted, "Without my input, Stallings redesigned the geographical areas and departments of responsibility for the Development Officers." Under "Reason for Current Concerns," plaintiff stated, "Relationship with Stallings has been deteriorating for the past 18 months. Stallings has excluded me from planning and areas of responsibility which I had previously been an active participant." Moreover, plaintiff noted, "I am currently scheduled for a 'mid-year review,' an event that had never occurred in my prior 9 years at NCSU.... After Stallings met with Dan O'Brien ... on 11/22, she cancelled my participation in the 12/2/13 meeting and scheduled the 'mid-year review' for 12/5/13."
 

 Lecceardone also averred that during the 6 January 2014 meeting with plaintiff and Hairston, plaintiff again claimed that Stallings had been leaving her out of meetings about assignments, and plaintiff complained that she was not invited to football games with donors. Plaintiff stated that she knew Stallings was having "secret HR meetings" with O'Brien, and she was aware that they had met on 22 November 2013. Lecceardone stated that based on the wide range of topics discussed and the dated issues, "[i]t was clear to me that Plaintiff believed her job to be in jeopardy and she was bringing forth anything and everything relating to her supervisor." In Hairston's affidavit, she stated that during the meeting, plaintiff "indicated to us that she thought her job was at risk because she was receiving criticism for her 'low numbers.' " Hairston's handwritten notes from the meeting reveal that one of plaintiff's concerns was that she was "no longer included in decision making for games."
 

 In Hinson's affidavit, she stated that on 7 January 2014, "plaintiff admitted during the meeting that there was a breakdown in her relationship with Defendant Stallings." Hinson also stated, "It is my practice and that of members of the Office of Internal Audit to never inform any person or department being investigated as to whom initiated the complaint."
 

 *921
 
 Mike Dickerson, Director of Information and Accounting Systems in Foundations Accounting and Investments, averred that Stallings contacted him in February 2014 and asked if she should be concerned about the audit. Dickerson told Stallings that IA had been planning to restart its randomized audits, "that they must be getting started back on that endeavor[,] ... [and] that she need not be concerned about the audit[.]"
 

 *504
 
 O'Brien averred that Stallings contacted him in the summer of 2013 to discuss plaintiff's performance and behavioral issues. At that time, he and Stallings discussed the possibility of discontinuing plaintiff's at-will employment. Stallings stated that a readiness report completed by consultant Charles Witzleben confirmed her suspicions about plaintiff's productivity. Witzleben's affidavit reveals that plaintiff's "time spent on corporate donors was not producing the results relative to time expended[.]" O'Brien stated that Stallings sought guidance on how to move forward with plaintiff, and Stallings suggested giving plaintiff six to twelve months to improve, unless plaintiff's performance and behavioral issues worsened, in which case she would move to discontinue plaintiff's employment. Based on his experience working in human resources, he stated that six to twelve months was more than enough time for an employee to show or fail to show improvement. O'Brien stated that he and Stallings discussed developing an improvement plan and conducting a mid-year review for plaintiff.
 

 O'Brien also averred that he met with Stallings on 22 November 2013 regarding an altercation with plaintiff the previous day, which was prompted by a conflict about an upcoming football game. According to O'Brien, Stallings stated that plaintiff was unprofessional and disrespectful, and her behavior was impacting the well-being, efficiency, and effectiveness of the office. O'Brien and Stallings again discussed discontinuing plaintiff's employment. O'Brien and Stallings met on 5 February 2014 regarding continued problems with plaintiff's performance. O'Brien stated that at this meeting, Stallings indicated she was ready to begin the process to discontinue plaintiff's employment.
 

 In Solomon's affidavit, he stated that beginning in 2011, Stallings had concerns about plaintiff and her reluctance to shift her fundraising focus from corporate gifts to individual giving of major gifts. By the summer of 2013, plaintiff did not adjust her focus, and Stallings again relayed her concerns about plaintiff's performance. Plaintiff began having negative interactions with Stallings and others in the Advancement Office, requiring Stallings to seek guidance from Human Resources and specifically, O'Brien, in Employee Relations. Solomon stated that in February 2014, Stallings informed him that she wanted to discontinue plaintiff's employment. Solomon stated that he gave his approval for Stallings to initiate the steps to move forward with discontinuation. He further stated that Stallings' decision was based on her assessment that plaintiff was no longer adding value to the unit and was not taking steps to work on deficiencies.
 

 *505
 
 In March 2014, Stallings provided Solomon with a written overview of the efforts she made over the last eighteen months to work with plaintiff. Solomon, O'Brien, and Stallings met in April 2014 to discuss plaintiff's departure, noting that because of her involvement with donors, "it was important to ensure that the discontinuation was handled appropriately and that a plan was in place to notify individual donors with whom Plaintiff had worked over the years." Additionally, he stated that "the timing of discontinuation was affected by a vacation that Plaintiff had planned around that same time period." Solomon averred that he "was completely comfortable making the recommendation to the Provost to discontinue Plaintiff's employment."
 

 Based on the above sworn statements of multiple individuals, as well as plaintiff's own admissions in her reports, the issues that ultimately prompted NCSU to terminate plaintiff's employment arose around eighteen months prior to the IA investigation. The record evidence shows that Stallings allotted a specific time period for plaintiff to improve, which did not prove successful, and that the decision to terminate plaintiff's employment was based on plaintiff's performance and behavior. Moreover, Stallings made the recommendation
 
 *922
 
 to terminate plaintiff's employment prior to being interviewed by IA and prior to learning that plaintiff alleged misconduct. Plaintiff's "belief" to the contrary, without more, does not constitute specific, non-speculative facts, discrediting defendants' non-retaliatory motive.
 
 Manickavasagar,
 

 238 N.C.App. at 430
 
 ,
 
 767 S.E.2d at 659
 
 . The official letter from the Provost informing plaintiff that her employment was terminated came several weeks later because multiple levels of approval were required. The delay was also due to the need to individually inform certain donors as well as plaintiff's scheduled vacation.
 

 Plaintiff has failed to raise a factual issue regarding whether the proffered reasons for terminating her employment were pretextual.
 
 Manickavasagar,
 

 238 N.C.App. at 430
 
 ,
 
 767 S.E.2d at 659
 
 . Accordingly, because defendants met their burden of showing that plaintiff cannot produce evidence to support an essential element of her claim-that there is a causal connection between the protected activity and the adverse action taken against her-the trial court properly granted summary judgment in favor of defendants.
 
 Newberne,
 

 359 N.C. at 788
 
 ,
 
 618 S.E.2d at 206
 
 .
 

 B. Tortious Interference With Contract Claim
 

 Next, plaintiff claims that the trial court erred in awarding defendants summary judgment on her tortious interference with contract claim.
 

 *506
 
 To survive a motion for summary judgment on a claim of tortious interference with contract, a plaintiff must forecast evidence of the following elements:
 

 (1) A valid contract existed between the plaintiff and a third person, conferring upon the plaintiff some contractual right against the third person;
 

 (2) the outsider had knowledge of the plaintiff's contract with the third person;
 

 (3) the outsider intentionally induced the third person not to perform his contract with the plaintiff;
 

 (4) in doing so the outsider acted without justification; and
 

 (5) the outsider's act caused the plaintiff actual damages.
 

 See
 

 Varner v. Bryan,
 

 113 N.C.App. 697
 
 , 701,
 
 440 S.E.2d 295
 
 , 298 (1994) (citing
 
 Childress v. Abeles,
 

 240 N.C. 667
 
 , 674,
 
 84 S.E.2d 176
 
 , 181-82 (1954) ).
 

 In
 
 Smith v. Ford Motor Company,
 
 our Supreme Court explained that the term "outsider" "appears to connote one who was not a party to the terminated contract and who had no legitimate business interest of his own in the subject matter thereof."
 
 289 N.C. 71
 
 , 87,
 
 221 S.E.2d 282
 
 , 292 (1976). A "non-outsider," however, "is one who, though not a party to the terminated contract, had a legitimate business interest of his own in the subject matter."
 

 Id.
 

 Nonetheless, "one who is not an outsider to the contract may be liable for interfering therewith if he acted maliciously."
 
 Varner,
 

 113 N.C.App. at 701-02
 
 ,
 
 440 S.E.2d at 298
 
 . "It is not enough, however, to show that a defendant acted with actual malice; the plaintiff must forecast evidence that the defendant acted with legal malice."
 
 Id.
 
 at 702,
 
 440 S.E.2d at 298
 
 . "A person acts with legal malice if he does a wrongful act or exceeds his legal right or authority in order to prevent the continuation of the contract between the parties."
 

 Id.
 

 At issue here is the fourth element of a claim. Plaintiff argues that "Stallings acted without justification when she induced NCSU to discharge [plaintiff.]" Further, plaintiff argues that although defendants attempt to justify plaintiff's discharge, "[s]ufficient evidence exists to raise a genuine issue of material fact as to the truth of each purported reason."
 

 "In order to demonstrate the element of acting without justification, the action must indicate 'no motive for interference other than malice.' "
 
 Area Landscaping, L.L.C. v. Glaxo-Wellcome, Inc.,
 

 160 N.C.App. 520
 
 , 523,
 
 586 S.E.2d 507
 
 , 510 (2003) (quoting
 
 Filmar Racing, Inc. v. Stewart,
 

 141 N.C.App. 668
 
 , 674,
 
 541 S.E.2d 733
 
 , 738 (2001) ). Here, plaintiff cannot
 
 *507
 
 establish that Stallings acted without justification. For the reasons stated in the previous section, the affidavits and record evidence show that
 
 *923
 
 Stallings had legitimate reasons to recommend that plaintiff's employment be terminated. Accordingly, because defendants have shown that plaintiff cannot produce evidence to support an essential element of her claim, the trial court properly granted summary judgment in favor of defendants.
 

 C. Constitutional Claim
 

 Lastly, plaintiff claims that the trial court "erred in dismissing [her]
 
 Corum
 
 claim." Plaintiff argues that she "presented evidence that her protected activity was a substantial or motivating factor in Defendants' decision to discharge her. Defendants cannot establish, by a preponderance of the evidence, that they would have discharged [her] in the absence of her protected activity."
 

 Plaintiff alleged a direct constitutional claim against NCSU and Stallings in both her official and individual capacities for violating plaintiff's right to freedom of speech. It is well established, however, that a "plaintiff may assert his freedom of speech right only against state officials, sued in their official capacity."
 
 Corum v. Univ. of North Carolina,
 

 330 N.C. 761
 
 , 788,
 
 413 S.E.2d 276
 
 , 293 (1992) ("[P]laintiff cannot rely on the Constitution to support a claim for money damages against individuals, acting in their personal capacities for the alleged violation of freedom of speech rights recognized under the Constitution.");
 
 Swain v. Elfland,
 

 145 N.C.App. 383
 
 , 391,
 
 550 S.E.2d 530
 
 , 536 (2001) ("To the extent that plaintiff alleges a
 
 Corum
 
 claim against defendants in their individual capacity, the claim must be dismissed."). Accordingly, the trial court properly granted summary judgment in favor of Stallings based on the claim against her in her individual capacity.
 

 In
 
 Corum,
 
 our Supreme Court held, "[I]n the absence of an adequate state remedy, one whose state constitutional rights have been abridged has a direct claim against the State under our Constitution."
 
 Corum,
 

 330 N.C. at 782
 
 ,
 
 413 S.E.2d at 289
 
 . In
 
 Swain v. Elfland,
 
 this Court held that a claim based on an alleged violation of North Carolina's Whistleblower Act was an adequate state remedy that precluded a direct cause of action for a violation of a plaintiff's right to free speech under the North Carolina Constitution.
 
 145 N.C.App. at 391
 
 ,
 
 550 S.E.2d at 536
 
 . Even though the plaintiff was unsuccessful on the Whistleblower Act claim, we held that the trial court properly dismissed the constitutional claim because the plaintiff had an adequate state law remedy available to him, which he pursued.
 

 Id.
 

 *508
 
 Here, plaintiff's claim under N.C. Gen.Stat. § 126-84 is an adequate state law remedy for her alleged free speech violation. Accordingly, the trial court properly granted summary judgment in favor of defendants on plaintiff's constitutional claim.
 

 III. Conclusion
 

 The trial court did not err in granting defendants' motion for summary judgment on plaintiff's Whistleblower Act claim, tortious interference with contract claim, and constitutional claim.
 

 AFFIRMED.
 

 Judges DAVIS and DIETZ concur.
 

 [1]
 

 The parties do not dispute that NCSU terminated plaintiff's employment, satisfying the second element, adverse action.