IN THE SUPREME COURT OF NORTH CAROLINA

No. 148PA14-2

Filed 22 March 2024

FRANKIE DELANO WASHINGTON and FRANKIE DELANO WASHINGTON, JR.

v.

TRACEY CLINE, ANTHONY SMITH, WILLIAM BELL, JOHN PETER, ANDRE T. CALDWELL, MOSES IRVING, ANTHONY MARSH, EDWARD SARVIS, BEVERLY COUNCIL, STEVEN CHALMERS, PATRICK BAKER, THE CITY OF DURHAM, NC, and THE STATE OF NORTH CAROLINA

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 267 N.C. App. 370 (2019), affirming an order entered on 11 May 2018 by Judge C. Winston Gilchrist in Superior Court, Durham County. Heard in the Supreme Court on 8 November 2023.

*Ekstrand & Ekstrand LLP, by Robert C. Ekstrand and Stefanie Smith, for plaintiff-appellant.[1]*

*Joshua H. Stein, Attorney General, by Joseph Finarelli, Special Deputy Attorney General, for defendant-appellees Tracey Cline and the State of North Carolina.*

*Daniel K. Siegel and Kristi L. Graunke for ACLU of North Carolina Legal Foundation; and Tin, Fulton, Walker & Owen, PLLC, by S. Luke Largess, and Christopher J. Heaney for North Carolina Advocates for Justice, amici curiae.*

DIETZ, Justice.

---

[1] Plaintiff Frankie Delano Washington passed away during this appeal and the Court allowed a motion to substitute his son as his personal representative.

Where there is a right, there is a remedy. This is a foundational principle of every common law legal system, including ours. We have long called it a "time-honored maxim." *See Von Glahn v. Harris*, 73 N.C. 323, 332 (1875). It is even enshrined in the North Carolina Constitution. *See* N.C. Const. art. I, § 18.

To protect this principle—to ensure that every right does indeed have a remedy in our court system—this Court created what are known as "*Corum* claims." *Corum v. Univ. of N.C.*, 330 N.C. 761 (1992). *Corum* claims are constitutional claims for damages directly against the State. These claims are extraordinary and defy many principles of this Court's jurisprudence, not least the principle that money damages against the State are barred unless the State has authorized them. Nevertheless, we held in *Corum* that where there is a right, there must be a remedy. *Id.* at 782. Thus, "in the absence of an adequate state remedy, one whose state constitutional rights have been abridged has a direct claim against the State under our Constitution." *Id.*

The question, then, is what constitutes an "adequate remedy." For decades since *Corum*, we have recognized that for a claim "to be considered adequate in redressing a constitutional wrong, a plaintiff must have at least the opportunity to enter the courthouse doors and present his claim." *Craig v. New Hanover Cnty. Bd. of Educ.*, 363 N.C. 334, 339–40 (2009). Applying this principle, we repeatedly recognized *Corum* claims where the plaintiff had no other forum in which to raise the constitutional violation and receive a remedy. But this Court has never recognized a *Corum* claim where the plaintiff had the opportunity to raise a constitutional

violation in court, did so and received a remedy, and then sought even more remedies in a second proceeding. Indeed, we have expressly rejected this approach. *See Copper v. Denlinger*, 363 N.C. 784, 788–89 (2010).

Yet this is what plaintiff asks this Court to do today. A jury convicted plaintiff of serious felony offenses including burglary, kidnapping, robbery, and attempted sex offense. During that criminal proceeding, plaintiff argued that the State violated his constitutional right to a speedy trial. He lost that argument at trial but won on appeal. As a remedy for the State's violation of his speedy trial rights, the Court of Appeals set aside plaintiff's criminal convictions.

In this action, plaintiff asserts that vacating his convictions was not enough. He also wants money damages from the State as a second remedy for the constitutional violation. As explained below, this request goes too far beyond the "critical limitations" set in *Corum*. 330 N.C. at 784. Plaintiff already received a powerful remedy for the State's violation of his rights—he had his criminal convictions permanently set aside. That remedy distinguishes this case from every successful *Corum* case in our jurisprudence, where the plaintiff had no opportunity to go to court and obtain a meaningful remedy at all. Instead, this case mirrors other, similar cases in which a plaintiff had an available remedy for a constitutional violation but still wanted greater relief. This scenario, we have held, does not permit a *Corum* claim.

In short, plaintiff had an adequate state law remedy, and a separate *Corum*

claim is unavailable. Thus, the Court of Appeals properly upheld the trial court's entry of summary judgment.

**Facts and Procedural History**

In 2002, law enforcement officers arrested plaintiff Frankie Delano Washington for a violent home invasion. Nearly five years later, plaintiff went to trial and a jury convicted him of multiple serious felonies including first-degree burglary, second-degree kidnapping, robbery with a dangerous weapon, and attempted first-degree sex offense.

In the years between plaintiff's arrest and his conviction at trial, plaintiff tried repeatedly to move the criminal process forward, for example, by seeking to expedite the State Bureau of Investigation's analysis of the evidence. Ultimately, three years after his arrest, plaintiff moved to dismiss the charges for violation of his constitutional right to a speedy trial. The trial court denied the motion, plaintiff's case went to trial, and, as noted above, the jury convicted plaintiff of multiple charges.

Plaintiff appealed his criminal convictions to the Court of Appeals and raised the speedy trial issue. He prevailed on that issue, and the Court of Appeals set aside his convictions on the ground that he had been deprived of his right to a speedy trial guaranteed by both the state and federal constitutions. *State v. Washington*, 192 N.C. App. 277, 297–98 (2008).

Several years later, plaintiff and his son brought this action against the State and various state and local officials. Plaintiff alleged that the State knew he was not

the perpetrator of the crimes for which he was charged. For example, plaintiff alleges that the State withheld evidence showing that another suspect committed numerous similar home invasions and sexual assaults in the same geographic area around the time of plaintiff's arrest. That suspect matched the description of the perpetrator of the crimes with which plaintiff was charged. Plaintiff also alleged that officials manufactured false evidence against him and ignored obviously exculpatory evidence.

Based on these allegations, plaintiff pursued a number of claims against officials involved in his prosecution. Among plaintiff's many claims, he asserted a common law claim against the State for damages caused by the deprivation of his state constitutional right to a speedy trial.

The parties later filed cross-motions for summary judgment, and the trial court entered summary judgment against plaintiff on his direct constitutional claim against the State. Plaintiff appealed that ruling to the Court of Appeals.

On appeal, the Court of Appeals affirmed the trial court's entry of summary judgment, holding that "no private cause of action for injunctive relief or damages lies in connection with the deprivation of the right to a speedy trial as guaranteed by Article I, section 18 of the North Carolina Constitution." *Washington v. Cline*, 267 N.C. App. 370, 375 (2019). Plaintiff then filed a notice of appeal based on a constitutional question and also petitioned this Court for discretionary review. We dismissed the appeal of right but allowed the petition for discretionary review.

**Analysis**

The North Carolina Constitution guarantees that "every person for an injury done him in his lands, goods, person, or reputation shall have remedy by due course of law." N.C. Const. art. I, § 18.

"This provision has ancient roots in English and American law." *Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*, 376 N.C. 558, 603 (2021). Its core concept is recited in some of the most impactful decisions in American jurisprudence. Take, for example, this passage from *Marbury v. Madison*: "It is a general and indisputable rule that where there is a legal right, there is also a legal remedy by suit or action at law whenever that right is invaded. . . . for it is a settled and invariable principle in the laws of England, that every right, when withheld, must have a remedy, and every injury its proper redress." 5 U.S. (1 Cranch) 137, 163 (1803).

This Court, too, has invoked the principle in landmark constitutional cases, holding, for example, that when "the provisions of a Constitution, as does ours, forbids damage to private property, and points out no remedy, and no statute affords one, for the invasion of the right of property thus secured, the provision is self-executing, and the common law, which provides a remedy for every wrong, will furnish the appropriate action for the redress of such grievance." *Sale v. State Highway & Pub. Works Comm'n*, 242 N.C. 612, 618 (1955) (cleaned up).

This Court's foundational expression of "where there is a right, there is a remedy" in the constitutional context is found in *Corum v. University of North*

*Carolina*, 330 N.C. 761 (1992). In *Corum*, a university professor brought suit against various arms of the State for violating his constitutional right to free speech. *Id.* at 766. At the time, there was no cause of action available for this type of state constitutional violation. *Id.* at 783. Recognizing that there must be a remedy for this right, the Court established what are now commonly known as "*Corum* claims," reasoning that "in the absence of an adequate state remedy, one whose state constitutional rights have been abridged has a direct claim against the State under our Constitution." *Id.* at 782.

Although *Corum* referred to the absence of an *adequate* state remedy, it never specified what remedies could be considered adequate. To be fair, though, it did not need to; the plaintiff in *Corum* had "no other remedy." *Id.* at 783.

But *Corum* did provide some guidance. The Court held that, when examining a *Corum* claim, "the judiciary must recognize two critical limitations." *Id.* at 784. "First, it must bow to established claims and remedies where these provide an alternative to the extraordinary exercise of its inherent constitutional power." *Id.* "Second, in exercising that power, the judiciary must minimize the encroachment upon other branches of government—in appearance and in fact—by seeking the least intrusive remedy available and necessary to right the wrong." *Id.*

From these limitations, we know that an adequate remedy does not mean a complete remedy—that is, the remedy that is necessary to make the plaintiff whole again. If a complete remedy were required, it would not be possible to "bow to"

alternative remedies or to choose the "least intrusive" remedy available. *Id.* Only a complete remedy would suffice. Instead, *Corum*'s discussion of these "critical limitations" shows that an adequate remedy is one that meaningfully addresses the constitutional violation, even if the plaintiff might prefer a different form of relief. *Id.* at 784.

Other cases following *Corum* confirm that an adequate remedy is a meaningful one, though not necessarily the one the plaintiff might prefer. For example, in *Craig v. New Hanover County Board of Education*, the plaintiff sued his county board of education for failing to protect him from a sexual assault at school. 363 N.C. at 335. He brought both common law claims and constitutional ones. *Id.* This Court held that his common law claims, which were barred by sovereign immunity, were not adequate remedies. *Id.* at 338. We explained that "to be considered adequate in redressing a constitutional wrong, a plaintiff must have at least the opportunity to enter the courthouse doors and present his claim." *Id.* at 339–40. Thus, the Court permitted a *Corum* claim because, without it, the plaintiff would "be left with *no remedy* for his alleged constitutional injuries." *Id.* at 340 (emphasis added).

By contrast, in *Copper v. Denlinger*, the plaintiff sued his county school board and other school officials seeking compensatory and punitive damages for allegedly suspending him without due process over "gang affiliated" conduct. 363 N.C. at 785–86. We rejected plaintiff's *Corum* claim in *Copper*, explaining that there was an administrative appeal process that could lead to the suspension being reversed. *Id.*

at 788–89. Thus, we reasoned, "under our holdings in both *Corum* and *Craig*, an adequate remedy exists at state law to redress the alleged injury, and this direct constitutional claim is barred." *Id* at 789.

Importantly, the "adequate remedy" in *Copper* was not the one the plaintiff sought. *Id.* at 786. He wanted relief including "compensatory and punitive damages" for the violation of his due process rights, not merely to have his school suspension set aside. *Id.* This Court nevertheless concluded that the administrative appeal process itself offered an adequate remedy under *Corum*. *Id.* at 789.

The lesson from these cases—and one that is consistent across all *Corum* decisions—is that an "adequate remedy" exists when the plaintiff has access to court to raise the constitutional violation, and the court can provide some form of relief for that violation, even if plaintiff does not view that relief as complete. By contrast, when the plaintiff has a cognizable state constitutional claim and cannot access the courts to obtain any form of relief, *Corum* is available. *Compare Deminski ex rel. C.E.D. v. State Bd. of Educ.*, 377 N.C. 406, 415 (2021) (*Corum* claim available because constitutional violation "cannot be redressed through other means"), *and Bunch v. Britton*, 253 N.C. App. 659, 669 (2017) (*Corum* claim available because absolute bar of governmental immunity left "no remedy at common law" for the violation), *with Copper*, 363 N.C. at 789 (*Corum* claim not available because there was remedy in administrative appeal); *Taylor v. Wake County*, 258 N.C. App. 178, 189–90 (2018) (*Corum* claim not available because plaintiff had tort claims in the Industrial

Commission, despite "limited" damages available on those claims); *and Wilcox v. City of Asheville*, 222 N.C. App. 285, 300 (2012) (*Corum* claim not available because plaintiff could sue police officers in their individual capacities).

Simply put, *Corum* is the embodiment of "where there is a right, there is a remedy." It applies when one's rights are violated, and the law offers either no remedy or a remedy that is meaningless. *Craig*, 363 N.C. at 340. In that circumstance, *Corum* creates a common law cause of action.

But that is the limit of *Corum*. It is not a state law equivalent of 42 U.S.C. § 1983. It does not guarantee a cause of action for money damages in every constitutional case where money damages otherwise are unavailable. It offers a court-created claim only in "extraordinary" circumstances where the law does not already provide other "established claims and remedies." *Corum*, 330 N.C. at 784. Like the plaintiff in *Copper*, many litigants who allege violations of their constitutional rights have access to established claims and remedies that are meaningful, even if not necessarily complete or the relief they want. These litigants cannot bring *Corum* claims. We knew this when we established the *Corum* doctrine and expressly embraced it when we outlined *Corum*'s "critical limitations." *Id.*

That brings us to this case. Plaintiff here argues that the State violated his constitutional right to a speedy criminal trial and that he has no other adequate remedy for the constitutional violation beyond this *Corum* claim for money damages. Plaintiff's argument cannot be squared with the precedent discussed above.

First, plaintiff has an alternative remedy. When criminal defendants believe they are being deprived of their right to a speedy trial, the Criminal Procedure Act expressly provides a mechanism to obtain court review and a remedy for the violation. *See* N.C.G.S. § 15A-954(a)(3) (2023). The Act provides that, "on motion of the defendant," the trial court "must dismiss" criminal charges if the defendant "has been denied a speedy trial as required by the Constitution of the United States and the Constitution of North Carolina." *Id.*

Second, this Court crafted the relief for a speedy trial violation specifically to ensure it was adequate to remedy the harm. Decades ago we held that the "right to a speedy trial is different from other constitutional rights" because of the difficulty of assessing when it is violated and what impact it has on the accused's defense. *State v. McKoy*, 294 N.C. 134, 140 (1978). We therefore held that "dismissal of the charges is the only possible remedy for denial of the right to a speedy trial." *Id.*

Dismissal of the charges is, of course, an incredibly meaningful remedy. Indeed, the Supreme Court of the United States has referred to dismissal for a speedy trial violation as an "unsatisfactorily severe remedy" because "it means that a defendant who may be guilty of a serious crime will go free, without having been tried." *Barker v. Wingo*, 407 U.S. 514, 522 (1972). Or, as in this case, it means a criminal defendant *convicted* of very serious crimes will go free.[2]

---

[2] As noted above, plaintiff alleges that various officials—primarily District Attorney Tracey Cline—manufactured evidence against him, pursued criminal charges, and asserted

As a result, and consistent with the "critical limitation" established in *Corum* that the judiciary "must bow to established claims and remedies where these provide an alternative to the extraordinary exercise of its inherent constitutional power," we reject the use of *Corum* claims in speedy trial cases because the law already provides an adequate remedy for that alleged constitutional violation. 330 N.C. at 784.

We close with one final point. The Court of Appeals decision in this case reached the correct outcome and we affirm it. But the Court of Appeals relied on *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). *Bivens* is a federal decision applicable only to federal constitutional claims against federal government agents. *Id.* at 397. The *Bivens* doctrine has some similarities to *Corum*, but it is not controlling in matters of our state constitution and state jurisprudence. Thus, while the reasoning of *Bivens* cases—in particular, those examining whether there are sufficient alternative remedies—may imbue them with some persuasive authority in a *Corum* case, the Court of Appeals should have started its analysis with *Corum*. It did not do so—in fact, it never cited *Corum* or any of its state law progeny in the decision. To the extent that this could be interpreted as holding that *Corum* is somehow coextensive with *Bivens*, we expressly disavow that notion. Like *Bivens* claims, *Corum* claims are extraordinary and subject to considerable limitations. But they are creatures of state law, and their analysis

---

his guilt, despite knowing he was not the perpetrator of the alleged crimes. Our decision today in no way discounts plaintiff's allegations.

should begin with our state law doctrine.

## Conclusion

Because there is an adequate alternative remedy for the alleged constitutional violation in this case, plaintiff's *Corum* claim is barred. We therefore affirm the decision of the Court of Appeals, which in turn affirmed the entry of summary judgment against plaintiff on that claim.

MODIFIED AND AFFIRMED.

Justice ALLEN did not participate in the consideration or decision of this case.

Justice EARLS dissenting.

In May 2002, police arrested and charged Frankie Delano Washington as a suspect in a home invasion. Mr. Washington's trial, however, did not start until February 2007—almost five years later. That years-long delay was not Mr. Washington's fault. It was the State's. *See State v. Washington*, 192 N.C. App. 277, 298 (2008). As he waited for trial—the shadow of the charges hanging over his head—Mr. Washington tried again and again (and again) to move his case along. As the years passed, he lodged a flurry of motions, asking the trial court to reduce his bond, to compel evidentiary testing, and, finally, to dismiss his charges.

But the State stalled. For three years, it withheld key evidence from forensic testing. When the trial court ordered the evidence tested, the State never alerted the labs. And even when the case was finally scheduled for trial, the State thrice asked to continue it.

Small wonder, then, that the Court of Appeals vacated Mr. Washington's conviction on speedy trial grounds, chiding that "if the State had exercised even the slightest care," the delay could have been avoided. *Id.* at 297. Relying on Article I, Section 18 of the North Carolina State Constitution—the Open Courts Clause—the Court found "overwhelming evidence" that the State's "repeated neglect and underutilization of court resources" caused the five-year delay and thus violated Mr. Washington's constitutional right to a speedy trial. *Id.* at 284.

Once outside the prison walls, Mr. Washington sought accountability from the

-14-

State and District Attorney Tracy Cline (DA Cline), the lead prosecutor in his case. To that end, he brought a civil suit for damages and injunctive relief, seeking redress for the harms inflicted by the State and beyond the reach of his criminal appeal. *See Washington v. Cline*, 267 N.C. App. 370 (2019). Mr. Washington—invoking this Court's landmark ruling in *Corum*—sued directly under the State Constitution and its guarantee of a speedy trial. *See State v. Patton*, 260 N.C. 359, 363–64 (1963).

But today, the majority extinguishes his claim and bars him from redressing the panoply of constitutional harms inflicted by the State. According to the majority, the dismissal of Mr. Washington's charges was an adequate remedy for his speedy trial violation. In other words, dismissal cured his constitutional injury—he is not entitled to more.

I disagree. The protections afforded by the speedy-trial right ripple beyond the criminal courtroom. And so too do the harms from the right's violation. When the State drags out a criminal case, it impairs the integrity of those proceedings and the reliability of the result. But the harms of that constitutional violation are far broader. The State's delay, among other things, jeopardizes the defendant's ability to provide for himself and his family, exposes him to health and safety risks, severs him from his community, hobbles his liberty, and robs him and his loved ones of opportunities to flourish.

Mr. Washington's case is a prime example. Dismissing his charges freed him from prison and voided the tainted proceedings that put him there. But it did not—

indeed could not—touch the constitutional harms in the world beyond the prison gates. No reasonable person would believe that mere release from custody and removal of a conviction is adequate redress for the years-long deprivation of their freedom. "Sorry we violated your rights, you can go home" is not a satisfactory remedy for the denial of this foundational right, especially when the charges were shaky and ill-examined from the start. That is precisely what *Corum* seeks to remedy. *See Corum v. Univ. of N.C.* 330 N.C. 761 (1992). When a plaintiff suffers "a colorable constitutional injury that c[annot] be redressed through other means," *Corum* provides relief. *Craig v. New Hanover Cnty Bd. of Educ.,* 363 N.C. 334, 342 (2009). Because vacating Mr. Washington's conviction was a half-measure, and because Mr. Washington lacks other avenues to fully redress his constitutional injuries, he may bring a *Corum* claim.

I start with the majority's view of *Corum* and the constitutional rights it protects. I then examine the constitutional guarantee of a speedy trial. After charting the contours of that right, I explain how its violation can inflict injuries beyond the criminal process and unreachable by criminal remedies. That is true of Mr. Washington. I examine his claims and how the State's constitutional breach harmed him in more ways than his criminal appeal could redress. And because his constitutional harms cannot be cured by criminal courts using criminal remedies, he may seek civil relief under *Corum*. Dismissing his charges was a partial fix—it cannot extinguish his right to full and fair redress for a constitutional violation. In holding

the opposite, the majority denies Mr. Washington the relief our Constitution affords and our precedent demands. Respectfully, I dissent.

## I.    *Corum*'s vision of constitutional rights and remedies.

On its face, this case asks what counts as an "adequate remedy" under *Corum*. But in truth, Mr. Washington's claim—like *Corum* itself—taps into deeper principles about constitutional rights and the judiciary's role in protecting them.

*Corum* made the point most clearly, mooring this Court's power to craft remedies to "the nature of constitutional government." *Corum*, 330 N.C. at 788. From the first, North Carolina's Constitution has opened with a Declaration of Rights—a catalogue of "individual and personal rights entitled to protection against state action." *Id.* at 782. Those fundamental guarantees—chiseled into constitutional stone—embody "the will of the people in this State." *In re Martin*, 295 N.C. 291, 299 (1978). They are "the supreme law of the State," and thus secured from impingement by "state officials and shifting political majorities." *Corum,* 330 N.C. at 786–87. The "fundamental purpose" of those rights is "to provide citizens with protection from the State's encroachment." *Id.* at 782. So at its inception—as today—the Declaration ensures that the "violation of constitutional rights is *never* permitted by anyone who might be invested under the Constitution with the powers of the State." *Craig*, 363 N.C. at 339 (emphasis added) (quoting *Corum*, 330 N.C. at 783).

From that, *Corum* derived a corresponding truth: A right requires a remedy. And not just any remedy, but one that breathes life into the right itself. That is, a

remedy worthy of a constitutional right must "protect th[e] right[ ] from encroachment by the State" and "correct the State's violation" of it. *Corum,* 330 N.C. at 787. Put differently, an adequate remedy provides a salve to a plaintiff's injuries and packs enough sting to deter future violations. *See* The Federalist No. 15, at 95 (Alexander Hamilton) (Cooke ed., 1961) ("It is essential to the idea of a law, that it be attended with a sanction; or, in other words, a penalty or punishment for disobedience. If there be no penalty annexed to disobedience, the resolution or commands which pretend to be laws will in fact amount to nothing more than advice or recommendation.").

Understandably, then, *Corum* rejected a paint-by-numbers approach to rights and remedies. Depending on "the right violated and the facts of the particular case," "[v]arious rights" may "require greater or lesser relief to rectify" their violation. *Corum,* 330 N.C. at 784. In other words, "[t]he nature of the right and the extent of the violation dictate the appropriate nature and extent of the corresponding remedy." *Hoke Cnty. Bd. of Educ. v. State*, 382 N.C. 386, 436 (2022) (citing *Corum,* 330 N.C. at 784). And so a grave breach of constitutional guarantees "demands a remedy of equivalent magnitude." *Id.*

Extending that logic, *Corum* tied constitutional remedies to the "purpose for the Declaration of Rights" and the "function and traditional role of the courts in North Carolina's constitutional democracy." *Corum,* 330 N.C. at 787. Because the judiciary "is the ultimate interpreter of our State Constitution," it "is the state judiciary that

has the responsibility to protect the state constitutional rights of the citizens." *Id.* at 783. That duty, however, is nothing new—the courts' "obligation to protect the fundamental rights" of citizens is "as old as the State." *Id.* And the power to vindicate rights carries with it the power to enforce them. That duty, too, "belongs to the courts." *See Hoke Cnty.*, 382 N.C. at 438. And the judiciary accomplishes that task by crafting relief and disbursing it in proper cases.

Thus, this Court's power to fashion remedies flows from and is coterminous with its constitutionally mandated duty to "protect the state constitutional rights of the citizens." *Corum*, 330 N.C. at 783; *see also Hoke County Bd. of Educ. v. State*, 358 N.C. 605, 642 (2004) ("[W]hen the State fails to live up to its constitutional duties, a court is empowered to order the deficiency remedied, and if the offending branch of government or its agents either fail to do so or have consistently shown an inability to do so, a court is empowered to provide relief by imposing a specific remedy and instructing the recalcitrant state actors to implement it."). *Corum* thus drew from a deeper strand of constitutional "spirit," and fortified this Court's "long-standing emphasis on ensuring redress for every constitutional injury." *See Craig*, 363 N.C. at 342. And at its heart, *Corum*'s promise is simple but profound: "[I]n the absence of an adequate state remedy, one whose state constitutional rights have been abridged has a direct claim against the State under our Constitution." *Corum*, 330 N.C. at 782.

In that vein, a plaintiff bringing a *Corum* claim "must allege that no adequate state remedy exists to provide relief for the injury." *Copper v. Denlinger*, 363 N.C.

784, 788 (2010). In fashioning relief, *Corum* flagged two restraints on this Court's remedial powers. When existing remedies do the job, we should bow to them. *See Corum*, 330 N.C. at 784. And of the remedies that would "right the wrong," we should choose the "least intrusive" one available. *Id.* Both rules rest on similar intuitions. When the law affords a fitting remedy for constitutional harms, fashioning an extra one is duplicative. And by needlessly reinventing the wheel, courts may spark friction with the other branches. *See In re Alamance Cnty. Ct. Facilities,* 329 N.C. 84, 100 (1991). So "in the interests of the future harmony of the branches" and in the "spirit of mutual cooperation," the judiciary should deploy its remedial authority with responsibility and pragmatism. *Id.* at 100–01.

The majority, however, converts *Corum*'s words of caution into its central teaching. According to the majority, a remedy is "adequate"—and thus *Corum* unavailable—if a plaintiff has "access to court to raise the constitutional violation, and the court can provide *some* form of relief for that violation." (Emphasis added). What counts as "some relief," we are not told. But it lies between a "meaningless" remedy and a "complete" one. The majority imports those bookends from *Corum*'s self-imposed limits. If citizens are entitled to complete relief, the majority reasons, "it would not be possible to 'bow' to alternative remedies or to choose the 'least intrusive' remedy available." To the majority, then, *Corum*'s pragmatic advice sets the ceiling on constitutional remedies and the judiciary's power to grant them.

I think that analysis has it backwards—it overstates the limits set by *Corum* and elevates form over substance, thus diluting this Court's duty to "guard and protect" constitutional guarantees. *Corum*, 330 N.C. at 785. Properly read, *Corum* does not require the judiciary to defer to existing remedies merely because they exist. And it does not mandate that we select the "least intrusive" remedy merely because it is the least intrusive. Instead, *Corum* guides *how* we fulfill our duty to mend constitutional wrongs, in a way that promotes responsibility, pragmatism, and inter-branch harmony. In other words, *Corum*'s prudential restraints do not—and cannot— swallow citizens' constitutional protections. And they cannot override our duty to "ensure that the violation of constitutional rights is *never* permitted by anyone who might be invested under the Constitution with the powers of the State." *Craig*, 363 N.C. at 342 (cleaned up).

Instead, as *Corum* itself made clear, we start by examining the constitutional injury and the relief needed to cure it. That inquiry and our answer will depend on "the right violated and the facts of the particular case." *Corum*, 330 N.C. at 784. "Various rights" in various contexts may "require greater or lesser relief to rectify" their violation. *Id. Corum*'s limits apply on the back end, not at the threshold—that is, after this Court examines the right denied and the redress due. Put differently, *Corum*'s restraints guide which remedy we select from the menu of satisfactory relief. If existing remedies vindicate the right, we should bow to them. And if various forms of relief would do the job, we should select the "least intrusive" course.

But we accede to those alternatives when—and only when—they suffice to "right the wrong." *Id.* If available mechanisms are too insipid to "correct the State's violation of the plaintiff's particular constitutional right at issue," they fall short of constitutionally adequate redress. *See id.* at 785. And in that case, this Court may—indeed must—"fashion a common law remedy." *Id.*; *accord In re Alamance Cnty. Ct. Facilities*, 329 N.C. at 101 (explaining that this Court should defer to "established procedural methods" like "statutory remedies" so long as they "do not stand in the way of obtaining what is reasonably necessary for the proper administration of justice"); *Hickory v. Catawba Cnty.*, 206 N.C. 165, 174 (1934) (explaining that indictment of commissioners did not bar courts from granting mandamus relief because a valid remedy must be "one competent to afford relief on the particular subject-matter of [a party's] complaint" and "[p]unishment of the defendants would not provide the relief to which the plaintiffs are entitled").

To bolster that point, *Corum* examined our decision in *Sale*. In that case, the State deprived a plaintiff "of his private property for public use." *See Corum*, 330 N.C. at 785 (quoting *Sale v. State Highway & Pub. Works Comm'n*, 242 N.C. 612, 618 (1955)). But the plaintiff could not air his constitutional grievance through existing channels of statutory, contract, or tort claims. *See id.* In response, this Court allowed his constitutional challenge "to proceed under the common law." *Craig*, 363 N.C. at 341. That was so because, when existing mechanisms are insufficient, the "common law, which provides a remedy for every wrong will furnish the appropriate action for

the adequate redress of such grievance." *Sale*, 242 N.C. at 618 (cleaned up). Even more, the available relief must align with and vitalize the constitutional right. "[N]othing short of actual payment, or its equivalent, constitutes just compensation," we explained—"entry of a judgment is not sufficient." *Corum*, 330 N.C. at 785 (quoting *Sale*, 242 N.C. at 618). We thus allowed the plaintiff to seek damages because it was the least intrusive remedy that "would correct the State's violation of the plaintiff's particular constitutional right at issue." *Id.*

Put another way, this Court did not start its analysis by examining the convenience of the existing options. If that were so, an "entry of a judgment" would be the obvious, far less burdensome choice. Instead, to safeguard the "fundamental law of this State, based on natural justice and equity," *Sale*, 242 N.C. at 618, we endorsed damages because that relief "would correct the State's violation" of the plaintiff's rights, and "we were unable to fashion" a "less intrusive" remedy to right the wrong, *Corum*, 330 N.C. at 785.

In broader perspective, too, the majority's view of remedies clashes with *Corum*'s reasoning and the principles animating it. If this Court must bend the knee to existing remedies, we, in effect, outsource our duty to interpret and enforce constitutional protections. And if we start by charting the "least intrusive" course, then we skew our Constitution's meaning to the lowest common denominator. The status quo and convenience are poor measures of constitutional worth. And a regime built on those foundations is a fragile one indeed. *Corum* recognized that point,

explaining that even long-standing doctrines like sovereign immunity "cannot stand as a barrier to North Carolina citizens who seek to remedy violations of their rights." *Id* at 785. To borrow *Corum*'s language, our constitutional protections are mere "fanciful gesture[s]" if they must yield to legal formalism. *Id.* at 786.

In that vein, I would anchor the analysis of an adequate remedy to the underlying right, the purposes animating it, and "the facts of the particular case." *Id.* at 784. Though this Court has offered sparse guidance on when a remedy is adequate, other states have tackled the question more directly—often citing *Corum*'s articulation of rights and remedies. Many courts—drawing on the Second Restatement of Torts—ask whether a remedy is "consistent with the purpose of and necessary to enforce" the constitutional right at issue, in view of the provision's "language and history." *Mack v. Williams*, 522 P.3d 434, 444–45, 448 (Nev. 2022); *see id.* at 451–52 (allowing damages remedy for violation of Nevada's search-and-seizure provision because it "remains essential to effectuate and advance the goals of" that constitutional right); *Katzberg v. Regents of the Univ. of Calif.*, 58 P.3d 339 (Cal. 2002); *Brown v. State*, 674 N.E.2d 1129, 1139 (N.Y. 1996) (allowing damages remedy for state constitutional violations because monetary relief is "consistent with the purposes underlying the duties imposed by these provisions and is necessary and appropriate to ensure the full realization of the rights they state"); *see also Godfrey v. State*, 898 N.W.2d 844 (Iowa 2017); *Dorwart v. Caraway*, 58 P.3d 128 (Mont. 2002);

*Widgeon v. E. Shore Hosp. Ctr.*, 479 A.2d 921 (Md. 1983); *Shields v. Gerhart*, 658 A.2d 924 (Vt. 1995).

That precedent in mind, I would hold that an adequate remedy exists when a plaintiff may vindicate his constitutional claim in court and, if successful, obtain relief that would both "right the wrong[s]," *Corum,* 330 N.C. at 784, and restrain future "encroachment by the State," *id.* at 787. On that view, an adequate remedy has one foot in the past and the other in the future. Looking backwards, a remedy should redress the constitutional harms inflicted by the State's breach, thus vindicating the "purposes underlying" the right and "the duties imposed by" it. *See Brown*, 674 N.E.2d at 1139. And looking forwards, it should realize the foundational purpose of our Constitution: To protect "rights from encroachment by the State," and to secure them from infringement by "state officials and shifting political majorities." *Corum,* 330 N.C. at 787.

Thus, to keep the State in check and the right intact, an adequate remedy must meaningfully deter future government illegality. *See Mack*, 522 P.3d at 448–49 (explaining that "a damages remedy furthers the purpose of [Nevada's] search-and-seizure provision to the extent it acts as a deterrent to government illegality"). In my view, that formulation is faithful to *Corum*'s vision, the "fundamental right[s]" it protects, and this Court's duty to its citizens. *Corum,* 330 N.C. at 783; *Hoke Cnty.,* 382 N.C. at 438 ("The duty to ensure . . . redress belongs to the courts.").

It also fits with our precedent. As the majority acknowledges, many of our *Corum* cases have dealt with patently inadequate remedies. We have held, for instance, that a claim barred by immunity is not "adequate by any realistic measure." *Craig*, 363 N.C. at 339. To supplant *Corum* relief, existing mechanisms must provide, at a minimum, the "possibility of relief under the circumstances." *Id.* at 340. So when a plaintiff lacks the "opportunity to enter the courthouse doors and present his claim," he lacks an adequate remedy. *Id.* So too when "state law does not provide for the type of remedy sought by the plaintiff." *Deminski v. State Bd. of Educ.*, 377 N.C. 406, 413 (2021) (cleaned up). In *Deminski*, for instance, the plaintiff sought compensatory and punitive damages, a permanent injunction, and attorneys' fees to remedy a school board's deliberate indifference to ongoing student harassment. *Id.* at 410. Because the "remedy sought . . . c[ould not] be redressed through other means," we held that "no other adequate state law remedy exist[ed]" for the plaintiff's colorable constitutional claim. *Id.* at 415. And even when a remedy exists in theory, it is not adequate if it "does not apply to the facts alleged by the plaintiff." *Craig*, 363 N.C. at 342. So a "statutory remedy to recover damages"—even if the "ordinarily exclusive" mode of redress—does not satisfy *Corum* if the "statutory cause of action" expires before a plaintiff may invoke it. *Id.* at 341 (citing *Midgett v. N.C. State Highway Comm'n,* 260 N.C. 241 (1963)). In each of those cases, the plaintiffs lacked an adequate remedy because they had no opportunity to "have the merits of [their] case heard and [their] injury redressed if successful on those merits." *See id.*

By contrast, in the lone case where an existing remedy was "adequate," that remedy closely fit—and thus fully vindicated—the constitutional right at play. *See Copper*, 363 N.C. at 788. In *Copper*, Mr. Douglas—a public school student—alleged that the Durham School Board violated his "state constitutional right to procedural due process." *Id.* at 788. He sued under *Corum,* asserting two procedural deprivations: That he was denied a "hearing before his long-term suspension from school," and that he "was never given" the chance to appeal the disciplinary measure. *Id.* at 788–89. Put another way, Mr. Douglas's constitutional injury was the deprivation of school access *without proper procedure*. We held that Mr. Douglas could not bring a *Corum* claim because existing mechanisms would "redress [his] alleged constitutional injury." *Id.* at 788. More specifically, we noted "two separate statutes" allowing students to appeal disciplinary decisions—including suspensions—to their school board and then the superior court. *Id.*

So while Mr. Douglas alleged a denial of proper procedure, existing channels "provide[d] a means of redressing such an injury" and curing the constitutional harm. *Id.* Nothing suggested that Mr. Douglas "was somehow barred from the doors of either the courthouse or the Board." *Id.* at 789. In other words, he "always had the statutory right to appeal." *Id.* But he never did so. Mr. Douglas neglected to take "any affirmative steps" to challenge his suspension, even with "representation from not one, but two, attorneys." *Id.* He never claimed that "it would have been futile to attempt to appeal his suspension" through the channels in place. *Id.* And he never

argued that existing statutory remedies were "inadequate or would fail to redress the alleged constitutional injury." *Id.* at 790. In short, Mr. Douglas could not bring a *Corum* claim to allege the denial of procedural due process when he "failed to avail [himself] of the due process offered under state law." *Id.* at 791.

*Copper* charted the contours of an adequate remedy. In that case, this Court withheld *Corum* relief because multiple statutes afforded Mr. Douglas the very procedure he sought. In other words, there was a close fit between the asserted harms and the available remedies. Fashioning extra relief was unnecessary and duplicative because existing statutes patched the alleged constitutional gaps. This Court thus bowed to those remedies because they "provide[d] a means of redressing" Mr. Douglas's constitutional harm—not because they merely existed. *Id.* at 788. *Copper*, then, hardly supports the idea that an adequate remedy need only provide "*some* form of relief." The lesson from that case is far more modest: When a plaintiff enjoys "a statutory right to appeal" that would "provide a means of redressing" an alleged deprivation of procedural due process, a separate *Corum* claim is redundant and unavailable. *Id.* at 788–89. That is especially true when the plaintiff does not dispute the sufficiency of existing mechanisms and has "failed to avail [himself] of the due process offered" by current law. *Id.* at 791.

Applied here, *Copper*'s conception of an adequate remedy underscores why Mr. Washington lacked one. In *Copper*, separate statutes furnished the plaintiff with the very procedure he claimed he was denied. Those remedies were thus adequate

because they allowed him to raise his claim and, if successful, fully cure his injury. Not so for Mr. Washington. A criminal appeal on speedy trial grounds involves limited claims, limited issues, and limited remedies. For that reason, Mr. Washington could only raise one facet of his constitutional violation and redress one facet of his injuries. Unlike in *Copper,* there was a yawning gap between his constitutional harms and the relief available. And so unlike in *Copper,* Mr. Washington had no forum to vindicate the full scope of his injuries and, if successful, to redress them.

Which raises a more fundamental difference between Mr. Washington's case and our precedent. In the majority's view, Mr. Washington is attempting to double dip on his remedies. Because he had the "opportunity to raise a constitutional violation in court," "did so," and "received a remedy," the majority frames his civil suit as a bid to snag "even more remedies in a second proceeding." But unlike other *Corum* claimants, Mr. Washington could not obtain relief in a single proceeding. In challenging his criminal conviction, Mr. Washington could *only* challenge his criminal conviction. He could not air the full spectrum of harms inflicted by the State's speedy trial violation or seek non-criminal forms of relief. Indeed, had he asked for damages in his criminal appeal, the courts would have jettisoned those claims at the threshold. *See* N.C.G.S. § 1-8 (2023) ("Where the violation of a right admits both of a civil and a criminal remedy, the right to prosecute the one is not merged in the other."); *see also Shore v. Edmisten*, 290 N.C. 628, 637 (1976) ("[T]he criminal trial itself may not be conducted to decide the question of how much damage or loss has been suffered.").

Mr. Washington thus lacked a mechanism to fully vindicate his speedy trial right and meaningfully redress the scope of the State's violation. For that reason, it is simplistic and distortive to frame his *Corum* claim as a grasping effort to nab a "second remedy" in a "second proceeding."

Most regrettably, recasting Mr. Washington as an opportunistic, double-dipping litigant cheapens *Corum*'s constitutional vision and this Court's duty to its citizens. This case is not about what Mr. Washington "wants," as the majority puts it. It is about the relief he is *owed* for the State's breach of his fundamental protections. Properly viewed, Mr. Washington does not seek multiple remedies for a single harm. He seeks redress for nine years' worth of harms stemming from the violation of his rights. *Corum* itself disclaimed the majority's artificial and rigid view of constitutional remedies, cautioning that the facts of the case and the nature of violation will "require greater or lesser relief to rectify" the harm. *See Corum*, 330 N.C. at 784. And to ignore the reality of Mr. Washington's case and the limited relief available in his criminal appeal injects rigidity where *Corum* prescribes flexibility.

Dismissing Mr. Washington's charges was an important first step. But it did not redress the varied harms stemming from the State's constitutional violation. For that reason, dismissal alone did not sufficiently vindicate his speedy trial right and the values underlying it. And for the same reason, Mr. Washington may bring a *Corum* claim to redress the constitutional injuries left untouched by his criminal appeal.

## II.    The harms of a speedy trial violation reach beyond and are not redressable by criminal process.

I next examine the "purposes underlying" the speedy trial right and "the duties imposed" on the State. *See Brown*, 89 N.Y.2d at 189. For North Carolinians, the right to swift justice is doubly protected. At the federal level, the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const., amend. VI. Our state constitution extends similar protections in more sweeping language, guaranteeing that, "All courts shall be open . . . and right and justice shall be administered without favor, denial, or *delay*." N.C. Const., art. I, § 18 (emphasis added); *see State v. McKoy*, 294 N.C. 134, 140 (1978). Both constitutional provisions sprang from the same historical roots. The right to "swift justice" lies "at the very foundation of our English law heritage." *Klopfer v. North Carolina*, 386 U.S. 213, 223 (1967). It was inscribed in Magna Carta and etched into our state and federal constitutions. *See id.* at 223–26. Today, the guarantee of a speedy trial remains "one of the most basic rights preserved by our Constitution," *id.* at 226, and is "secured by the fundamental law of this State," *McKoy*, 294 N.C. at 140.

On its face, the right to a speedy trial seems crafted for and cabined by criminal proceedings. But that guarantee is of broader constitutional berth. The U.S. Supreme Court has recognized as much. *See Barker v. Wingo*, 407 U.S. 514, 519 (1972). This Court has, too. *See State v. Hollars*, 266 N.C. 45, 50–51 (1965); *see also State v. Johnson*, 275 N.C. 264 (1969). And because the right extends beyond the criminal

process, so must the remedy for its violation. Dismissing Mr. Washington's charges—on its own—resolves a narrow slice of the State's harms. It does not mend the constitutional injuries or ward off future constitutional violations. And it thus fails "to effectuate and advance the goals of" the speedy trial guarantee. *See Mack*, 522 P.3d at 452.

The right to a speedy trial is "generically different" from other constitutional protections for criminal defendants. *Barker*, 407 U.S. at 519. It ensures that the defendant is "treated according to decent and fair procedures." *Id.* at 519–20. And it limits "the possibilities that long delay will impair the ability of an accused to defend himself." *United States v. Marion*, 404 U.S. 307, 320 (1971) (quoting *United States v. Ewell*, 383 U.S. 116, 120 (1966)). Extended delays, for example, may prevent witnesses from accurately recalling events. *Barker*, 407 U.S. at 532. And in the lag between arrest and trial, witnesses may die or disappear. *Id.* For that reason, "persons who are detained between arrest and trial are more likely to receive prison sentences than those who obtain pretrial release." *Id.* at 533 n.35. That procedural imbalance "skews the fairness of the entire system." *Id.* at 532. And so, of the available *criminal* remedies, we have held that "dismissal of the charges is the only possible remedy" when the State withholds a speedy trial. *McKoy*, 294 N.C. at 140. That said, "the major evils protected against by the speedy trial guarantee exist quite apart from actual or possible prejudice to an accused's defense." *Marion*, 404 U.S. at 320. What, then, are these evils?

When a defendant is left lingering in jail awaiting trial, that time is "dead time." *Barker*, 407 U.S. at 533. It means job loss and a "drain [on] his financial resources." *Id.* at 537 (White, J., concurring) (quoting *Marion*, 404 U.S. at 320). Evidence bears that out. People "detained in jail while awaiting the resolution of their criminal cases" lose "almost $30,000 in foregone earnings and social benefits" over the "course of the working-age life cycle." Will Dobbie & Crystal Yang, *The Economic Costs of Pretrial Detention*, Brookings Papers on Econ. Activity, at 251, 251, 253 (2021). Pretrial criminal involvement also dissuades employers from conducting interviews, making it substantially harder for defendants awaiting trial to find jobs. *See* Terry-Ann Craigie et al., *Conviction, Imprisonment, and Lost Earnings* 13 (Brennan Ctr. for Just. 2020), https://www.brennancenter.org/our-work/research-reports/conviction-imprisonment-and-lost-earnings-how-involvement-criminal [hereinafter Craigie, *Conviction, Imprisonment, and Lost Earnings*]. While a defendant's case is delayed, that time "means time out of the workforce," slashing the likelihood of gainful employment. *Id.* Further, "child support payments, credit card debt, rent, and other living expenses" accrue during pretrial detention and increase due to late charges or unpaid interest. Ram Subramanian et al., *Incarceration's Front Door: The Misuse of Jails in America* 15 (Vera Inst. of Just., Feb. 2015), https://www.vera.org/downloads/publications/incarcerations-front-door-report_02.pdf [hereinafter Subramanian, *Incarceration's Front Door*]. And if a defendant is convicted, their economic prospects face even steeper hurdles. Formerly

imprisoned people "earn nearly half a million dollars less over their careers than they might have otherwise." Craigie, *Conviction, Imprisonment, and Lost Earnings* at 6–7.

More broadly, the harms of a speedy trial violation ripple through families and communities. *Id.* at 7. Over half of pretrial detainees have children under 18. *See* Dobbie & Yang at 253. Children with parents in prison report higher rates of mental health and behavioral problems. *See* Sara Wakefield, *Incarceration, Families, and Communities: Recent Developments and Enduring Challenges,* 51 Crime & Just. 399, 404–05 (2022). Those trends extend into the teenage years. *See id.* at 405. Adolescents with incarcerated parents report higher rates of teenage aggression and external behavioral problems, such as depression and anxiety. *Id.* Economically, too, a speedy trial violation can alter children's life trajectory. Studies suggest that pretrial detention has intergenerational spillover effects—counties with "high levels of pretrial detention when children are young (age 7-12) exhibit significantly lower levels of intergenerational mobility for children" when they reach adulthood. *See* Dobbie & Yang at 254; *see also id.* at 283–88.

Pretrial detention also affects a broader set of family members, including partners, parents, and siblings. *See* Wakefield at 407. Incarceration of a partner increases material insecurity, homelessness, and financial strain. *Id.* at 407–08. Secondary expenses also mount, including costly visits to prisons and the toll of lengthy separations. *See id.* at 408. Families feel the brunt of that strain. Lost

earnings, for instance, add up when one parent's imprisonment forces the other parent to quit their job and provide childcare. *See* Dobbie & Yang at 260. Other costs soon follow. A family's money is shunted into commissary accounts, phone and video calls, court costs, criminal justice debt, and the cost of an attorney. *See* Craigie, *Conviction, Imprisonment, and Lost Earnings* at 7; *see also* Dobbie & Yang at 252. Even when the parent is released from incarceration, the reentry period can pose an "acute stressor when families try to reunite with little access to supportive services." *See* Wakefield at 408.

The right to swift justice also lessens the "overcrowding and generally deplorable" conditions of jails. *Barker*, 407 U.S. at 519–20. Incarceration "jeopardizes health and well-being" because people who need health care while in prison may not receive any treatment and may be forced to adopt survival behaviors that are not marketable in the workplace. Craigie, *Conviction, Imprisonment, and Lost Earnings* at 13. As the COVID-19 pandemic laid bare, there is "greater prevalence of contagious diseases in jails" that increases lethal outcomes for detainees, especially those with chronic health problems. Subramanian, *Incarceration's Front Door* at 17.

The speedy trial right has a communal facet, too. As the U.S. Supreme Court has noted, delay leaves the defendant "unable to lead a normal life because of community suspicion and his own anxiety." *Barker*, 407 U.S. at 527. It also subjects him to "public obloquy" and "seriously interferes with [his] liberty." *Id.* at 537 (White, J., concurring) (quoting *Marion*, 404 U.S. at 320). This "cloud of anxiety, suspicion,

and . . . hostility," *id.* at 533, fuels the cycle of incarceration, "making jail a gateway to deeper and more lasting involvement" in the criminal justice system, Subramanian, *Incarceration's Front Door* at 5.

In short, the right to a speedy trial guarantees fair criminal proceedings and protects against prejudice. But it reaches beyond the criminal process to forestall injuries that exist far apart from procedural fairness. As such, when the State violates that right and delays a defendant's day in court, it inflicts harms that the criminal process simply cannot remedy.

III.    **Dismissing Mr. Washington's charges did not redress the full scope of his constitutional harms.**

This case exemplifies the sprawling harms that flow from a speedy trial violation. Mr. Washington's complaint details the injuries inflicted outside the criminal process and beyond the reach of any criminal remedy. In recounting his harms, we treat the allegations in his complaint as true and view the facts in his favor.

After his arrest, Mr. Washington spent more than 366 days in the Durham County Jail because he could not afford the $1 million bond. During that time, Mr. Washington lost his job as an auto mechanic. His ten-year-old son was also victimized. When Mr. Washington was arrested, his son was left "home alone" and not found until a day later. *Washington*, 192 N.C. at 277. Mr. Washington's "sudden separation" from his son stretched for the duration of his confinement. *Id.*

After a year in detention and four motions asking for bond reduction, Mr. Washington was forced to pay $37,500 just to secure release. Even when freed from formal detention, Mr. Washington's liberty was straitjacketed by the conditions in his pretrial release order. He remained subject to those restraints on his liberty as the State delayed his trial, refused to test critical evidence, and ignored other suspects.

When his trial finally started—almost five years after his arrest—the delay preceding it "significantly impaired Mr. Washington's defense." Many witnesses struggled to remember "events that occurred nearly five years" before and could not "recall details pertinent to the defense." Police witnesses, in particular, "recalled no details" from the arrest or investigation, reciting statements from old reports without remembering enough facts to respond to cross-examination. Across all categories of witnesses, the common refrain was "I don't recall." And Mr. Washington's inability to meaningfully cross-examine witnesses was devastating, as the "prosecution relied at trial solely on the witnesses' long-faded memories."

Because of the State's years-long delay, Mr. Washington lost "direct evidence of [his] actual innocence," and the "ability to challenge pretrial identification evidence." That stale evidence, in turn, created "a substantially greater likelihood that the in-court identifications would result in misidentification of [Mr. Washington] as the perpetrator of the offenses." And given the witnesses' muddled memories, Mr. Washington could not meaningfully probe their description of events, challenge their credibility, or "otherwise expose the multiple dimensions of their identifications'

unreliability." Mr. Washington was then convicted and sentenced to consecutive multi-year terms of imprisonment. *See Washington*, 192 N.C. App. at 281.

Even after the Court of Appeals overturned his conviction, Mr. Washington's injuries persisted. Incensed by public criticism, DA Cline continued to make "numerous false, conclusory assertions of [Mr. Washington's] guilt to representatives of the media." In fact, she "insisted that a local newspaper publish all of" her comments despite the newspaper warning her of the risks of publicizing "false statements." Her "multiple false, stigmatizing assertions relating to" Mr. Washington cropped up in "written correspondence with representatives of the news media" and were "re-published and amplified" by DA Cline in interviews.

In short, since his arrest in 2002, Mr. Washington felt the full weight of the State's systemic failures. He was deprived of his liberty, sustained "irreparable harm to his reputation," and suffered "severe, disabling emotional, mental, and physical harm." While handling his case, the State and its agents marked Mr. Washington "as an infamous violent criminal who committed racially motivated crimes." In effect, the State turned Mr. Washington "into a public pariah, subjecting him to extreme and sustained public obloquy." Both he and his family endured "public scorn, taunts, and insults." And the State's attacks on his character were reprinted by "local media" and amplified by "national publications that reproduced those local reports." Even after the dismissal of charges, Mr. Washington will never escape the stains of the "false allegations that Defendants advanced and repeatedly publicized." And because of the

State's long-running denial of his speedy trial rights, Mr. Washington struggled with "severe and chronic depression, anxiety, and other diagnosable conditions."

Economically, too, Mr. Washington bore the costs of the State's actions. He lost his job as well as opportunities for "education, training, earnings, and earning capacity." And those economic losses were even more staggering because Mr. Washington "was required to incur exorbitant costs associated with securing bail, retaining professional assistance in connection with the criminal proceedings against him, and other expenses in connection with defending against the unlawful criminal proceedings." Mr. Washington's family suffered as well. Because of the State's constitutional violation, Mr. Washington's son, for instance, was deprived of his father's care, support, and guidance.

## IV. Because dismissing Mr. Washington's charges did not—and could not— cure his constitutional harms, it is not an adequate remedy.

The majority holds that dismissing Mr. Washington's charges "meaningfully" remedies nine years' worth of constitutional injuries. In other words, releasing him from prison and removing his faulty conviction is "good enough"—anything more is a windfall. I disagree.

As a criminal remedy, dismissal addresses just one facet of Mr. Washington's injuries: The integrity of his conviction. If Mr. Washington challenged his conviction alone—as he successfully did in his criminal appeal—then the majority would be correct; the scope of the State's speedy trial violation is cured. The Court of Appeals recognized as much, explaining that "in the context of his *criminal* prosecution, [Mr.

Washington] has already received the only acceptable remedy for the violation of the speedy trial right." *Washington*, 267 N.C. App. at 373 (emphasis added).

But that is not the case before us. Mr. Washington has filed "a civil lawsuit, not a criminal prosecution." *Id.* And he does not seek "to overturn his criminal convictions, but to redress harms he allegedly suffered as a result of the denial of his right to a speedy trial." *Id.* In other words, Mr. Washington invokes *Corum* to redress all the major evils inherent in violating his constitutional guarantees—evils that exist vastly apart from the prejudice that the State injected in his criminal conviction. Though dismissal is a "meaningful remedy" for his *criminal* prosecution, it does nothing for the injuries that stand apart from procedural unfairness.

To the majority, however, that distinction makes no difference. Under its ruling, Mr. Washington is now barred from receiving compensation for all the past and future economic losses he suffered. He is barred from receiving compensation for the physical injuries he suffered and the emotional trauma he endured. He no longer has a means to redress the liberty and privacy he was stripped of. He cannot be compensated for the education, training, and earnings he lost, nor for the time missed with his son. And Mr. Washington cannot even repair the damage to his reputation from the criminal proceedings and DA Cline's mudslinging.

In my view, however, a criminal procedural remedy for a criminal procedural violation does not foreclose civil relief for civilly cognizable harms. Again, *Corum* prescribed a flexible, fact-specific analysis of rights and their corresponding remedies:

"[v]arious rights that are protected by our Declaration of Rights may require greater or less relief to rectify the violation of such rights, *depending upon the right violated and the facts of the particular case.*" *Corum*, 330 N.C. at 784 (emphasis added). Of course, a different case with a different claimant might warrant different relief. The redress due to Mr. Washington, for instance, is quite different than the redress due a defendant who successfully raised a speedy trial claim, secured prompt release, and suffered minimal hardships. But categorically extinguishing civil relief, as the majority does today, is a sprawling step that ignores the disjuncture between criminal cases and civil suits, and the relief available through each.

Indeed, this Court has also recognized the divide between criminal and civil remedies, and the discrete interests vindicated through those channels. Most relevant here, we have allowed civil redress for violations of a defendant's right to a speedy trial. In *Simeon v. Hardin*, 339 N.C. 358 (1994), a group of defendants awaiting trial brought a civil action against the Durham County district attorney for breaching their speedy trial rights. According to the defendants, prosecutors declined to schedule their cases "for trial for the tactical purposes of keeping [them] in jail, delaying a trial at which [they were] likely to be acquitted," and "pressuring [them] into entering a guilty plea." *Id.* at 378. The defendants also linked the alleged constitutional violations to concrete harms. By denying the defendants a speedy trial, prosecutors exacted "pretrial punishment," worked to "surprise criminal defense counsel," and "impair[ed] the quality of criminal defendants' legal representation."

*Id.* The violations also "force[d] criminal defendants released on bail to miss work and come to court repeatedly," *id.* at 364, as well as to "incur[ ] unnecessary witness-related expenses," *id.* at 378.

This Court allowed the defendants to seek civil remedies for their constitutional claims. *Id.* at 379. We explained that "the issues raised by [the defendants] could not be authoritatively settled in their individual criminal cases and the relief sought could not be adequately provided by the criminal court." *Id.* at 368. True, the civil cases overlapped with criminal proceedings. But we reasoned that "the civil action in this case does not involve the same issues as [the defendants'] individual criminal prosecution." *Id.* at 367. For that reason, the civil claims were "collateral to the underlying criminal charges against [them] and the issues which normally arise during a criminal prosecution." *Id.* And the relief sought—declaratory and injunctive relief—is "more adequately addressed in a civil action." *Id.* at 368. *Simeon* thus makes clear that the criminal process simply does not provide adequate relief to redress injuries inherent in violations of the speedy trial right. That is true for Mr. Washington, just as it was for Mr. Simeon.

## V.    Conclusion

The majority starts and ends with a familiar legal refrain: For every right, there is a remedy. That is true. But the deeper issue is whether a remedy is enough to sustain a right. As *Corum* recognized, rights and remedies are symbiotic—one without the other is nothing at all. And when one wilts, the other does too.

For that reason, a constitutional violation demands a correlatively robust remedy—one that secures the right "from encroachment by the State," and vindicates its purpose and underlying values. This Court, after all, has "the responsibility to protect the state constitutional rights of the citizens." *Corum*, 330 N.C. at 783. And when we leave a constitutional violation insufficiently redressed, we cheapen the underlying right and disserve the citizens it protects.

With those principles in mind, I would hold that dismissing Mr. Washington's charges was not an adequate remedy for his speedy trial violation. Standing alone, that remedy redressed only a sliver of the harms inflicted by the State. Though dismissal corrected his defective conviction, it did not—and could never—remedy the full scope of his constitutional injuries. To vindicate his speedy trial right—and to secure that protection for others, too—Mr. Washington should be allowed to seek the civil relief needed to "right the wrong." *See id.* at 784. *Corum* gives him that chance, and I would allow his claim to continue. By divesting Mr. Washington of the remedy he is due, the majority erodes the right itself. I respectfully dissent.

Justice RIGGS joins in this dissenting opinion.